UNITED STATES of America ex rel. Willie SEALS, Jr., Appellant,

v.

Martin J. WIMAN, Warden, Kilby Prison, Montgomery, Alabama, Appellee.

No. 19391.

United States Court of Appeals
Fifth Circuit.

May 30, 1962.

Rehearing Denied June 29, 1962.

Charles S. Conley, Montgomery, Ala., for appellant.

MacDonald Gallion, Atty. Gen., of Alabama, George D. Mentz, Asst. Atty. Gen., Montgomery, Ala., for appellee.

Before RIVES, BROWN and WISDOM, Circuit Judges.

RIVES, Circuit Judge.

Seals, a Negro, was convicted of the rape of a white woman and was sentenced to death by electrocution. His conviction was affirmed by the Supreme Court of Alabama. Seals v. State, 1960, 271 Ala. 142, 122 So.2d 513. A petition for leave to file in the trial court a petition for writ of error coram nobis was denied by the Supreme Court of Alabama, Ex parte Seals, 1961, 271 Ala. 622, 126 So.2d 474. Certiorari was denied by the Su-

preme Court of the United States, "without prejudice to an application for a writ of habeas corpus in the appropriate United States District Court." Seals v. Alabama, 1961, 366 U.S. 954, 81 S.Ct. 1909, 6 L.Ed.2d 1246. Application was made pursuant to that suggestion, and this appeal is from the judgment of the district court denying the application for habeas corpus. The questions presented on appeal are stated in the brief filed on behalf of Seals as follows:

*"Questions Presented*

"1. Whether the all-white grand jury which indicted and the all-white petit jury which convicted the relator reflected a continuous pattern of discrimination against Negroes and limitation of Negroes in respect to jury selection and thus were selected in violation of the Fourteenth Amendment to the Constitution of the United States.

"2. Whether the conviction of relator can be sustained under the Fourteenth Amendment to the Constitution of the United States in view of the segregated system of justice, including the segregated court house, by and in which the defendant was tried.

"3. Whether the conviction of the relator can be sustained under the Fourteenth Amendment to the Constitution, in view of the misleading newspaper publicity appearing prior to the trial of the relator herein, contributing to the generation of an atmosphere of hysteria and prejudice, which publicity was instigated by the police and prosecuting officials.

"4. Whether the conviction of the relator can be sustained under the Fourteenth Amendment to the Constitution of the United States in view of the limitations upon the exercise of voting rights of Negroes by various branches of the Government of the State of Alabama, and the impact of such limitations upon the appellate judiciary which is re-

quired by the Constitution of the State to be elected.

"5. Whether the sentence of relator can be sustained under the Fourteenth Amendment to the Constitution of the United States in view of the fact that the conviction and sentence of death was affirmed by the State Supreme Court on the basis of evidence involuntarily extracted from relator during a period of illegal detention.

"6. Whether the sentence of the relator can be sustained under the Fourteenth Amendment to the Constitution in view of the consistent disparity of treatment as between white and Negro offenders in the State of Alabama."

Of the foregoing questions, those numbered 2, 4 and 6 were not presented to the State courts on the appeal from the judgment of conviction, on the petition for leave to file coram nobis, or in any other manner. Those questions cannot therefore be considered here. See 28 U.S.C.A. § 2254. "It has long been settled that the federal courts will not consider on habeas corpus claims which have not been raised in the state tribunal * * *" Darr v. Burford, 1950, 339 U.S. 200, 203, 70 S.Ct. 587, 94 L.Ed. 761; see also, Morris v. Mayo, 5 Cir., 1960, 277 F.2d 103, 105.

The three remaining claims to which this appeal is limited may be conveniently listed as (1) evidence illegally obtained; (2) misleading newspaper publicity; and (3) racial discrimination in jury selection. The first two of these claims do not appear to us to justify relief by habeas corpus, but because of the imposition of the death penalty they will be discussed.

### I. Evidence Illegally Obtained.

The commission of the crime by two young Negro men on a white woman was conclusively established by the evidence. Its details are sufficiently described in the opinion affirming Seals' conviction. Seals v. State, 1960, 271 Ala. 142, 122 So.2d 513. The crime was committed about midnight on Sunday, June 15, 1958.

The victim identified Seals and a Negro named Lott as the men who raped her. The officers obtained a confession from Lott in which he said that he and Seals pulled the victim from a telephone booth, beat, robbed and raped her. Lott repudiated that confession, claiming that it had been obtained by beating and threats, and Lott did not testify against Seals. Following Seals' trial, Lott was tried separately, found guilty and sentenced to life imprisonment.

Seals has, from the beginning, denied that he was one of the guilty parties. He was defended upon his trial by a white lawyer employed by his family. Six Negro witnesses were introduced to establish an alibi for Seals. Three Negroes testified to Seals' good character. And Seals testified in his own behalf.

The day following the commission of the crime, the officers arrested about twenty Negro men and took them to the police station for questioning. Of these they "booked" five. During the afternoon of that day, the officers went to the home of Josephine Coulston, a Negro woman who lived two lots away from the filling station at which was located the phone booth from which the victim had been dragged. Seals was at the Coulston woman's home and, along with other members of the household, he was questioned but was not then arrested. At the time Seals was wearing a blue-green plaid shirt.

About 8:00 o'clock the following morning a friend of Seals, one John Middleton, was arrested, questioned, and then released. About 1:00 P.M. Middleton met Seals on the street near Middleton's home, and told Seals that the police were looking for a Negro wearing a blue plaid shirt. According to Middleton, Seals asked that they exchange shirts, and, according to Seals, Middleton exclaimed, "Man, you got one on. If you don't want to be picked up, best thing you can do is pull it off." Seals pulled off the shirt and left it with Middleton, and put on Middleton's shirt. About fifteen minutes

later, at about 2:00 P.M., Tuesday, June 17, Seals was arrested while walking along the street.

Seals was then questioned for about four and a half hours. Among other subjects, the officers questioned him as to the whereabouts of the shirt he had worn the day before. The officers deny beating Seals at this time or at any time during any of the questioning periods. After several hours of questioning Seals told the officers that the shirt was at his, Seals' home, in order, according to Seals, to stop the officers from beating him. The officers searched Seals' home for about 35 minutes before Seals admitted to them that he had given the shirt to Middleton. The shirt was then recovered and was introduced in evidence upon Seals' trial. The Alabama Supreme Court held that the testimony of Middleton about the shirt was admitted without error, saying, "Any indication of a consciousness of guilt by a person suspected of or charged with a crime or who may, after such indications, be suspected or charged is admissible evidence against him." Seals v. State, 1960, 271 Ala. 142, 122 So.2d 513, 516. Peculiarly there was no testimony to connect the plaid shirt with the crime in any way, and even the police were not sure why they considered it important.

Seals was returned to jail, and on the next day, Wednesday, June 18, was questioned by the officers in relays from 8:30 A.M. until dark. No confession was obtained, but the officers did get certain admissions which put Seals near the scene of the crime at the time of its commission. Seals told the officers that he had passed a car in the ditch on Chestang Street somewhere around midnight, the time of the commission of the crime, and that he had then heard the voices of two men and the muffled screams of a woman coming from the vicinity of an outside toilet, that he had stood there listening for some ten minutes before going home. At the trial Seals claimed that he had made these admissions to stop beatings, and that in fact he had neither seen the car nor heard the voices and screams.

Seals claims that he was questioned on Thursday as well, and at one time Detective Bryant stated that Seals was questioned continually from the time of his arrest until the arrival of one lawyer Finch late on Thursday. Bryant then stated, however, and all the other officers agreed, that Seals was not questioned at all on Thursday. On the afternoon of Thursday, the 19th, a lawyer named Finch from New York came to the police station to find Seals and obtain his signature on a warranty deed unrelated to the criminal charge. Bryant told Finch that he did not know where Seals was, and Finch was forced to get a court order allowing him to see Seals. The testimony of Finch has never been obtained by deposition or otherwise. On Thursday evening, Seals was transferred to the Mobile jail. He was questioned at least 40 minutes on Friday in the Mobile jail by Mobile and Prichard police, and was at that time confronted by his co-defendant Lott and Lott's confession implicating Seals. Seals also claimed that while in the Mobile jail he was kept continually in solitary confinement and could not tell night from day. He was there from the time his lawyer, Mr. Johnson, first saw him Thursday night, the 19th, until he was sent to Mt. Vernon for psychiatric tests, apparently about a month later. Detective Donald Riddle of the Mobile Police admitted that the one time he visited Seals in his cell in Mobile, Seals was in solitary confinement.

Seals was not identified by the victim as one of her two assailants until July 2. After the crime she was kept in the hospital for ten days and then confined to her home. July 2 was apparently the first time she was well enough to make the identification. There is no evidence in the trial record of when a warrant for Seals' arrest was issued or when he was brought before a magistrate. Two newspaper clippings admitted in the habeas corpus proceedings below would indicate that a hearing in the recorder's court was first set for July 1 for Seals and Lott, and that it was actually held on July 8. The issue of delay in arraignment was never

raised during the trial or on appeal, and, while it has been raised here, there is no evidence in the habeas corpus hearing as to when a warrant of arrest was issued or an arraignment held.

■ The appellants urge that such admissions as were drawn from Seals with reference to the plaid shirt and to his presence near the scene of the crime were illegally obtained and relies particularly on Culombe v. Connecticut, 1961, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037, and also on other Supreme Court decisions.[1] The present state of the record, however, does not authorize relief on that ground, especially when those admissions, as well as Seals' confrontation by Lott, who had confessed implicating Seals, were all introduced into evidence without objection on the State's cross-examination of Seals.

II. Misleading Newspaper Publicity.

Newspaper reporters obtained from the officers and from the State prosecuting attorney information as to Lott's confession in which he implicated Seals, and articles appeared about that confession in the Mobile newspaper. The Mobile Press article of June 20 stated in part:

"Circuit Solicitor Carl M. Booth and Prichard Police Chief Cecil M. Rambo said Lott signed a statement admitting participation in the attack, naming Seals as his accomplice.

\* \* \* \* \* \*

"Details of Lott's confession were withheld, but it was revealed that Lott said he and Seals pulled the woman from the telephone booth and beat and robbed her of some $4 beside the filling station.

"Lott was quoted as saying that following the beating, he and his companion dragged the victim some 200 yards to the rear of a Negro churchyard where both men raped her."

The Mobile Register's article of June 20 stated in part:

"Details of Lott's confession were withheld, but it was revealed that the Negro said he and Seals pulled the woman from the telephone booth and beat and robbed her of some $4 beside the filling station."

The Mobile Register's article of June 28 stated in part: "Police said Lott has signed a statement admitting participation in the attack and implicating Seals."

■ The Mobile Press on November 10, 1958, published the fact that Lott had repudiated his confession:

"Lott testified today that he was forced to sign an alleged confession taken from him by police the day of his arrest June 19. He did not elaborate."

Seals' trial took place on December 2nd, 3rd and 4th. The jurors were not questioned as to whether they had read any of the newspaper articles. There was no motion for change of venue. The attorney who represented Seals upon his trial testified in the habeas corpus proceeding that he knew of no facts and no opinions which would have supported such a motion. Lott was not called as a witness by either side; his confession was not offered in evidence; and the fact that he had confessed and implicated Seals came into the case without objection on the State's cross-examination of Seals. While the possibility of injustice exists, in our opinion, the petitioner did not sustain his burden to prove that he had been denied a fair trial because of adverse newspaper publicity. See Irvin v. Dowd, 1961, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751.

III. Racial Discrimination in Jury Selection.

The remaining claim that Negroes were systematically excluded from the grand jury and from the petit jury is more substantial. The persons qualified

1. Reeves v. Alabama, 1954, 348 U.S. 891, 75 S.Ct. 214, 99 L.Ed. 700; Ashcraft v. Tennessee, 1946, 327 U.S. 274, 66 S.Ct. 544, 90 L.Ed. 667; Vernon v. Alabama, 1940, 313 U.S. 547, 61 S.Ct. 1092, 85 L.Ed. 1513; Canty v. Alabama, 1939, 309 U.S. 629, 60 S.Ct. 612, 84 L.Ed. 988.

for jury service are chosen initially by a Jury Commission. This Commission is composed of three members appointed by the Governor. Code of Alabama 1940, Title 30, Sections 8, 9, 10. The qualifications of jurors [2] and the duty of the Jury Commission to place them on the jury roll are set forth in Section 21 of the same Title.

"§ 21. *Qualifications of persons on jury roll.*—The jury commission shall place on the jury roll and in the jury box the names of all males citizens of the county who are generally reputed to be honest and intelligent men and are esteemed in the community for their integrity, good character and sound judgment; but no person must be selected who is under twenty-one or who is an habitual drunkard, or who, being afflicted with a permanent disease or physical weakness is unfit to discharge the duties of a juror; or cannot read English or who has ever been convicted of any offense involving moral turpitude. If a person cannot read English and has all the other qualifications prescribed herein and is a freeholder or householder his name may be placed on the jury roll and in the jury box. No person over the age of sixty-five years shall be required to serve on a jury or to remain on the panel of jurors unless he is willing to do so."

The census data for 1950 introduced into evidence shows the following distribution of male population 21 years of age and over for Mobile County:

| | | |
|---|---|---|
| White | 45,309 | 68.3+% |
| Nonwhite | 21,016 | 31.7−% |
| Total | 66,325 | 100% |

As is shown by Section 21 of Title 30, 1940 Code of Alabama, heretofore quoted, men over the age of 65 years cannot be *required* to serve on a jury. According to the 1950 census, the distribution of the male population of Mobile County between the ages of 21 years and 65 years is as follows:

| | | |
|---|---|---|
| White | 41,618 | 68.3−% |
| Nonwhite | 19,326 | 31.7+% |
| Total | 60,944 | 100% |

The male population of jury age in Mobile County was therefore divided substantially in the proportions of 68.3% whites and 31.7% nonwhites.

There was no testimony in this case that, on the average, Negroes in Mobile County are any less qualified for jury service than are whites. Indeed, the testimony of one of the jury commissioners and of a practicing attorney in Mobile were to the effect that the reputations and qualifications of members of the two races were about the same. Requests for admission, which were served on the respondent in accordance with Rule 36 of the Federal Rules of Civil Procedure and which were taken as admitted by the court below and accepted in evidence, indicate that in 1958, the year of Seals' trial, and the preceding ten years, less than 2% of the persons on the jury rolls were Negroes.

Nevertheless, the district court found that on the record as a whole there was no evidence that the jury commissioners had actively discriminated or had not exercised the utmost good faith in seeking out qualified Negroes to place on the jury rolls.

To review these findings requires a short statement of the manner by which juries are selected in Mobile County. Pink application cards are handed out by the Commissioners to prospective jurors. Several times a month the Commissioners meet to pass on the qualifications of the applicants. As the Commissioners simplify the standards, they are: over 21, of good character, and no felonies. To establish good character, the Commissioners rely on one of the following sources: the personal knowledge

---

2. The persons exempt from jury service are listed in Title 30, Section 3, but no question of exemption is involved in this case.

of one of the Commissioners, the opinion of a respected citizen who recommends the applicant, or the applicant's employer. At times, the fact that an applicant belongs to a responsible organization such as the Junior Chamber of Commerce will suffice. If they feel it is likely that the applicant may have ever been in trouble, they will check with the law enforcement authorities for felonies. When approved, a duplicate white card is made out which is placed on file. These white cards make up the jury roll, which numbered over 7,000 in 1958 and about 10,000 now. The attrition from the jury roll each year due to death, age, or change of residence is from 400 to 600. This is roughly the number that must be replaced each year to keep the roll supplied. Every year in the Fall, about five or six thousand of the jury roll cards are placed in the jury box, being chosen from the rolls according to the frequency of prior jury service. Once a month during the court term, the presiding judge takes a handful of cards from the jury box and counts out the number of cards needed for the jury venires for each week. The names of the venire list for a week are summoned by the sheriff to appear at the first of that week. The presiding judge excuses those who have cause, selects 18 by lot if a Grand Jury is required, and holds the rest for the petit juries for the week. At the end of the week the Clerk of Court makes out the venire lists which are in the record and returns them with the white jury cards to the Jury Commissioners.

Prior to 1954, the white jury cards had the race of the juror indicated. At that time, Mobile Circuit Judge Eddington suggested to the Commissioners that all racial marks should be removed from the cards. New cards were made out for all marked cards during the next two years, and, except for a few oversights, no cards had racial marks after 1956. It is to be noted, however, that the jury rolls were not purged; the same names remained on the roll, but with a new card. Since the turnover on the jury roll is only about 600 names a year, a majority of the 1958 jury roll had been on the roll in 1954 when race was still indicated on the cards.

Except for this carryover of names on the jury rolls and the implication to be derived from the racial markings prior to 1954, there is no direct evidence of intentional discrimination. However, the question of whether the "course of conduct" of the Commissioners "operates to discriminate in the selection of jurors on racial grounds" [3] bears more careful scrutiny.

Prior to 1960, the Commissioners personally handed out the majority of the pink application cards (the remaining applicants came by the office), and they handed them out only one at a time to individuals whom they knew, although on one or two occasions Commissioner Allen thought he had asked a Negro minister for the names of qualified Negroes. The only sources of Negro applicants the Commissioners could name were the waiters at Morrison's Cafeteria, the Negroes working at the downtown hotels, those at the shoe shine parlors, mail carriers, and a few they came in contact with through business. Commissioner Allen noted that they often choose names from the rosters of various organizations such as the Junior Chamber of Commerce or the Kiwanis Club. When asked if he had ever used the roster of a Negro club or association, he replied no, that no one had ever given him one. Both the Commissioners admitted that the bulk of their friends, social contacts, and acquaintances were white. On the basis of this evidence we see no sufficient effort to solicit the names of qualified Negroes beyond the admittedly narrow circle of ordinary contacts of the Commissioners.

This conclusion is highlighted by the change which began to take place in 1960 after the issue of jury discrimination was raised for the first time in a criminal trial. The Commissioners testified

3. Hill v. Texas, 1942, 316 U.S. 400, 404, 62 S.Ct. 1159, 86 L.Ed. 1559.

that a number of Negro ministers came to them and asked for a meeting to discuss means of increasing the number of Negroes on the jury rolls. At that meeting, for the first time, the Commissioners gave each of the ministers a batch of blank application cards and asked them to give them to Negroes who they felt were qualified. Since then the practice has also been extended so as to give blank cards to Negro attorneys, of which there are two in Mobile, for them to hand out.[4]

The implications and conclusions to be drawn from this evidence turn to a considerable extent on whether the requests for admissions are taken as conclusively establishing that less than 2% of the persons on the jury rolls are Negroes. The bulk of the respondent's argument on appeal dealt with the lower court's alleged error in accepting the requests in evidence as admitted, and the lower court itself, while taking the requests as admitted, discounted their weight. We therefore turn to these two issues.

On October 12, 1961, the attorney for Seals undertook to serve on the Attorney General of Alabama, by leaving a copy at his office, a detailed request for admissions under Rule 36, Federal Rules of Civil Procedure. The original of the request with a certificate of service was filed in court on the same date, October 12, 1961. The request for admissions is of such importance that, with the exception of the caption and the Exhibits, we quote the request in full:

"To: Jerry Coe, Esq.
 "Assistant Attorney General of Alabama

 *"REQUEST FOR ADMISSION*

"Willie Seals, relator, requests the defendant within ten days after service of this request to admit for the purpose of this action only and subject to all pertinent objections to admissibility which may be inter-

posed, that each of the following statements is true:

"1. That the grand jury which indicted the relator in the case known as State of Alabama v. Willie Seals, the subject matter of the within proceeding included 18 persons, none of whom was a member of the Negro race.

"2. That the petit jury which tried relator Willie Seals in the foregoing case included 12 persons, none of whom was a member of the Negro race.

"3. That between October 5, 1948 and June 1956, a total of 28 grand juries were drawn and impaneled in Mobile County, Alabama, each containing 18 persons and that on only 3 of said grand juries did Negroes sit, as follows:

| Date of Grand Jury | Name of Negro Grand Jurors |
| --- | --- |
| October 3, 1950 | John C. Collier |
| October 7, 1952 | Jerome A. Rogers |
| January 6, 1953 | Nelver Carter |

"4. That the jury roll of Mobile County, Alabama, in use between September 30, 1955 and September 30, 1956, contained 7,435 names, of which 120 were Negroes, their names being attached hereto as Exhibit A.

"5. That the jury roll of Mobile County, Alabama, in use between October 1, 1956 and September 30, 1957, contained 7,349 names, of which 99 were Negroes, their names being attached hereto as Exhibit B.

"6. That the jury roll of Mobile County, Alabama, in use between October 1, 1957 and September 30, 1958, contained 8,433 names, of which 99 were Negroes, their names being attached hereto as Exhibit C.

"7. That the jury roll of Mobile County, Alabama, in use between October 1, 1958 and September 30,

---

4. Many of these facts are taken from the Commissioners' depositions which were admitted in evidence at the close of the hearing.

1959, contained 9,713 names, of which 109 were Negroes, their names being attached hereto as Exhibit D.

"8. That between October 3, 1948 and July 1, 1949, a total of 2,463 persons were drawn, impaneled and sworn to serve as jurors in the Mobile County Court, of which number 40 were Negroes, their names being attached hereto as Exhibit E.

"9. That between October 2, 1949 and July 1, 1950, a total of 2,343 persons were drawn, impaneled and sworn to serve as jurors in the Mobile County Court, of which number 29 were Negroes, their names being attached hereto as Exhibit F.

"10. That between October 1, 1950 and July 1, 1951, a total of 2,467 persons were drawn, impaneled and sworn to serve as jurors in the Mobile County Court, of which number 28 were Negroes, their names being attached hereto as Exhibit G.

"11. That between September 30. 1951 and July 1, 1952, a total of 2,456 persons were drawn, impaneled and sworn to serve as jurors in the Mobile County Court, of which number 16 were Negroes, their names being attached hereto as Exhibit H.

"12. That between October 5, 1952 and July 1, 1953, a total of 2,417 persons were drawn, impaneled and sworn to serve as jurors in the Mobile County Court, of which number 21 were Negroes, their names being attached hereto as Exhibit I.

"13. That between October 4, 1953 and July 1, 1954, a total of 2,401 persons were drawn, impaneled and sworn to serve as jurors in the Mobile County Court, of which number 16 were Negroes, their names being attached hereto as Exhibit J.

"14. That between October 3, 1954 and July 1, 1955, a total of 2,251 persons were drawn, impaneled and sworn to serve as jurors in the Mobile County Court, of which number 29 were Negroes, their names being attached hereto as Exhibit K.

/s/ "Charles S. Conley

"Charles S. Conley
"Attorney for Relator"

Under the terms of the request for admissions and Rule 36, Federal Rules of Civil Procedure, each of the matters of which an admission is requested is deemed admitted for the purposes of the pending action unless within 10 days after service of the request "the party to whom the request is directed serves upon the party requesting the admission either (1) a sworn statement denying specifically the matters of which an admission is requested or setting forth in detail the reasons why he cannot truthfully admit or deny those matters or (2) written objections on the ground that some or all of the requested admissions are privileged or irrelevant or that the request is otherwise improper in whole or in part, together with a notice of hearing the objections at the earliest practicable time."

By the time of the hearing on the merits in Mobile, on October 24, 1961, no answer, objection or response of any kind had been served or filed. Mr. Coe for the respondent stated:

"MR. COE: We have no written responses, Your Honor. We have informed counsel for the relator we would not agree to those admissions, with the exception of possibly the first two. We don't have any way of knowing if those facts are true or not."

After considerable argument, the district court ruled:

"On the original request there is a certificate of request dated the 12th day of October '61 and unless that is contested then the request for admissions was timely, the orig-

inal request and the provisions of Rule 36 do apply. There has been no objection and no sworn statement I believe as the rule provides denying the matters contained in the request. So the relevant facts of which admissions were requested in the original request for admissions on October 12, will be taken as established."

A formal written response was filed by the respondent on October 30, 1961, consisting mostly of objections to the request, but stating:

"10. Respondent admits the truth of statements 1 and 2 of said request.

"11. Respondent neither admits nor denies statements 3 through 14, inclusive of said request."

■ The respondent objects to the court's acceptance of the admissions as true on the grounds that:

1) The principal attorney for the respondent was out of town during the 10-day period, a fact known to the petitioner. However, the respondent had been put on notice at the preliminary hearing on September 22 that the petitioner was working on the jury records and intended to come up with certain facts which could be stipulated by the parties, and also the requests were served five days before the

principal attorney had indicated he had to be in Washington. Further, the requests were directed to Mr. Coe, an assistant attorney in the case, who, according to his own affidavit attached to appellee's brief on appeal, handled the request for admissions during the 10-day period. The district court's finding that service was proper finds ample support in all of the facts and circumstances.

■ 2) The respondent claims that because the source of the data in the requests is not mentioned, the requests should not be admitted. Rule 36, however, does not indicate that the source need be designated. In addition, the respondent's tardy answer in the court below indicates that the petitioner's attorney sent the Attorney General a copy of a letter to the presiding judge dated October 12, 1961, wherein the petitioner's attorney offered to "cooperate with the Attorney General, in advising him as to the method by which we arrived at the material set forth in the request for admission." There is no evidence that that offer was accepted.[5]

■ 3) Several of the respondent's objections are directed to the grammatical form, the content, and various conflicts between the requests and other evidence in the record. None of these, however, go to the question of admissibility, but only to the effect the court

---

5. The source of that material is thus stated in a footnote to the appellant's brief.

"While not relevant to the force of the admissions, there is no mystery as to the source of the statistical facts which were included therein:

"1. Admissions 4 to 7 cover the jury rolls for the years 1955 to 1959. Photocopies of these jury rolls were made from the original rolls on file with the Jury Commission. Thereupon a detailed review of the names thereon was made by a group of volunteers who were very well acquainted with the citizenry of Mobile and particularly well-suited to make a racial survey. This group carefully checked the lists, noting which persons were white and which persons were Negroes. The results of their check appear in the admissions.

"2. Admissions 8 to 14 cover the jury venires and admission 3 covers the grand

jury for the years 1948 to 1954. The official records for those years no longer being extant, the information was derived from the *Mobile Press Register*. The testimony of the Clerk of the County Court was that the jury venires and grand jury lists were regularly published in the *Press Recorder* (Tr. 81), the Clerk of Court having made it a practice to give copies of the venires to the press (Tr. 87). There was no problem in ascertaining the racial distribution for the years 1949 to 1952 because the listing in the *Press Register* contained the racial designations. (This was before Judge Eddington's 'suggestion' had become operative.) For the years 1953 to 1954 racial designations no longer appeared in the *Press Register*, but were made on the basis of personal knowledge by persons particularly well acquainted with the Negro community."

will give them in weighing all the evidence. See Woods v. Robb, 5 Cir., 1948, 171 F.2d 539.

■ 4) The respondent objects that the requests "contain statements and figures, the implication of which was one of the principal issues of appellant's case." The requests on their face indicate that no legal conclusions or ultimate facts have been included, and it is irrelevant to their admissibility that they will support certain legal conclusions. To say that the court cannot draw legal conclusions from facts found in requests for admissions would be to eliminate any purpose for Rule 36.

■ 5) The respondent claims that he cannot answer the requests because the information is not available to him on the basis of a reasonable inquiry. This issue, however, should have been directed to the district court in a timely filed answer to the requests.

Finally, even if this Court were to accept the answer of the respondent as timely filed on October 30, the requests must stand as admitted under the requirements of Rule 36. For that answer discloses no valid objection to the requests, no good excuse for the failure to answer them, and no showing that the respondent had made a reasonable inquiry to ascertain their truth.

■ The respondent questions whether the presumption of admission created by Rule 36 applies against a sovereign State. The respondent is, of course, not the State but the individual Warden. If he be treated as the State's alter ego, the rule is nonetheless well settled that, "Habeas corpus is a civil proceeding governed by the Federal Rules of Civil Procedure, Rules 1, 81(a) (2), 28 U.S.C. Hunter v. Thomas, 10 Cir., 173 F.2d 810, 812; 25 American Jurisprudence 151, Section 12, Note 19." Bowdidge v. Lehman, 6 Cir., 1958, 252 F.2d 366, 368. The Rules apply even against the United States. Mosseller v. United States, 2 Cir., 1946, 158 F.2d 380, 382. They apply also against the respondent.

While the district court made a formal holding that the admissions requested would be taken as established, it actually discounted them in the following manner:

"It is quite apparent that the number and names of Negro citizens on the jury roll and in the jury box, embodied in the request for admissions, were obtained from venire lists returned by the Clerk of the Circuit Court to the jury commission. Obviously, there may have been many others who claimed exemptions or who were excused for any other reason before such venire lists were prepared. In short, the matters deemed to have been admitted refer only to the minimum, not the maximum, number of Negro Jurors."

There seems to be no warrant for the assumption that, with respect to the number of Negroes on venire lists prior to 1955, more Negroes than whites claimed exemptions or were excused before the venire lists were prepared. And with respect to the jury rolls for the crucial years between 1955 and 1958, the information is based not on the jury venires but on the jury *rolls* from which no people are excused.

Moreover, the evidence, other than the admissions, of the number of Negroes on jury venires is substantially in accord with the admissions—not contrary to them as the district court implies. By checking the names on the admissions against the venire lists, it appears that almost half the jury venires, which average from 50 to 60 people, had no Negroes on them. The testimony of the witnesses, who were relying on their best recollections, gives rise to no precise figures with which the admissions can be compared. It does indicate, however, in accord with the admissions that a substantial number of the venires had no Negroes on them. Of the State officials close to the jury operation, Commissioner Allen testified that he had seen Negroes on venires "quite often" and "on many occasions"; Commissioner Quina and

Clerk of the Court Mandeville testified that they had seen them "regularly"; County Solicitor Booth, who prosecuted Seals, testified that Negroes appeared on the 18-man Grand Juries which are chosen by lot "quite frequently," although never more than one or two. The other witnesses were primarily attorneys, both white and Negro, who testified from their experience in court. All but one of them state conclusions supporting the testimony of the State officials. The depositions of the Seals jury members as to their previous jury experience are so vague as to have little probative value one way or the other.

Further, the requests dealing with the years prior to 1953 have special weight since they are based on color designations found in the weekly publication of the venire lists in the Mobile Press Register at a time when race was still indicated on the jury cards. These early figures then give weight to the later figures since all qualified jurors remain on the jury rolls from year to year. Thus a great many of those on the rolls in 1953 were still on the rolls in 1958, persumably with the same racial ratio. It is also unlikely that the new members put on the roll in the interval would change this ratio significantly since, as Mr. Allen, Chairman of the Jury Commission, testified, the method of selecting new people for the jury rolls had not changed between 1951–1954 and 1958–1960. We are therefore unable to agree with the district court that the figures in the admissions should not be given decisive weight.

 Basing our opinion on these findings we are further unable to agree with the lower court that systematic exclusion of Negroes from the grand and petit jury was not established as a matter of law. The opinion of the district court that Negroes were not systematically excluded from the grand and petit juries of Mobile County was based upon a direct application of such subjective tests as whether the jury commissioners "have made a good faith effort to place on the jury roll * * * the names of all Negro citizens * * * who possess

the qualifications required * * *," and whether their efforts have been performed "conscientiously." Many of the cases speak in terms of "purpose to discriminate," "intentional discrimination," "intentional exclusion" and "purposeful, systematic non-inclusion because of color." E. G., Akins v. Texas, 1945, 325 U.S. 398, 403, 404, 65 S.Ct. 1276, 89 L. Ed. 1692; Cassell v. Texas, 1950, 339 U. S. 282, 290, 291, 70 S.Ct. 629, 94 L.Ed. 839; Eubanks v. Louisiana, 1958, 356 U. S. 584, 587, 78 S.Ct. 970, 2 L.Ed.2d 991. Those same cases, however, and others, recognize a positive, affirmative duty on the part of the jury commissioners and other state officials, and show that it is not necessary to go so far as to establish ill will, evil motive, or absence of good faith, but that objective results are largely to be relied on in the application of the constitutional test. For example, in Akins v. Texas, supra, the Court said, "But such defendants are entitled to require that those who are trusted with jury selection shall not pursue a course of conduct which results in discrimination 'in the selection of jurors on racial grounds.'" 325 U.S. 403, 65 S.Ct. 1276. In the opinion of Justice Reed announcing the judgment of the Court in Cassell v. Texas, supra, it was said: "When the commissioners were appointed as judicial administrative officials, it was their duty to familiarize themselves fairly with the qualifications of the eligible jurors of the county without regard to race and color. They did not do so here, and the result has been racial discrimination." 339 U.S. at 289, 70 S.Ct. at 629. In Eubanks v. Louisiana, supra, Justice Black, speaking for the Court, quoted with approval a passage which makes it clear that the important finding relates to the result of the operation of the jury selection plan:

"In Patton v. Mississippi, 332 U.S. 463, 469, [68 S.Ct. 184, 92 L.Ed. 76] this Court declared, in a unanimous opinion, that 'When a jury selection plan, whatever it is, operates in such a way as always to result in the complete and long-continued ex-

clusion of any representative at all from a large group of Negroes, or any other racial group, indictments and verdicts returned against them by juries thus selected cannot stand.' This is essentially the situation here." (356 U.S. at 587, 78 S.Ct. at 970.)

In Hill v. Texas, 1942, 316 U.S. 400, 404, 62 S.Ct. 1159, 86 L.Ed. 1559, Chief Justice Stone, speaking for the Court, said that it is the constitutional duty of the jury commissioners,

" * * * not to pursue a course of conduct in the administration of their office which would operate to discriminate in the selection of jurors on racial grounds. Discrimination can arise from the action of commissioners who exclude all negroes whom they do not know to be qualified and who neither know nor seek to learn whether there are in fact any qualified to serve. In such a case, discrimination necessarily results where there are qualified negroes available for jury service."

Perhaps the positive, affirmative duty resting upon the jury commissioners and other officials is best stated by Chief Justice Vinson speaking for the Court in Avery v. Georgia, 1953, 345 U.S. 559, 561, 73 S.Ct. 891, 97 L.Ed. 1244:

"The Jury Commissioners, and the other officials responsible for the selection of this panel, were under a constitutional duty to follow a procedure—'a course of conduct'—which would not 'operate to discriminate in the selection of jurors on racial grounds.' Hill v. Texas, 316 U.S. 400, 404 [62 S.Ct. 1159 86 L.Ed. 1559] (1942). If they failed in that duty, then this conviction must be reversed—no matter how strong the evidence of petitioner's guilt. That is the law established by decisions of this Court spanning more than seventy years of interpretation of the meaning of 'equal protection.' "

The State trial court ordered the sheriff to summon 110 persons "for the venire from which the jury to try this case shall be selected." Seals v. State, 1960, 122 So.2d 513, 514. The Alabama Supreme Court in denying Seals' petition for permission to file a petition for writ of error coram nobis took considerable comfort from the fact that of this number two were Negroes:

"While it is not pertinent to a decision of the matter now before us, we here point out that it is shown by one of the affidavits attached to the petition in this case that two members of the Negro race were included in the panel from which the jury who tried petitioner was struck. That would not have been possible had the jury box not contained the names of Negroes, and it was the same jury box from which the grand jury was drawn which indicted the petitioner."

Ex parte Seals, 1961, 271 Ala. 622, 126 So.2d 474, 476.

The federal district court likewise seemed to think that the presence of a very few Negroes on a venire would suffice to refute the claim of systematic exclusion:

"There was testimony of a convincing nature from witnesses, including prominent trial lawyers, that through the years immediately preceding relator's trial there were usually two or three Negro jurors present on each panel summoned for duty. One attorney testified that shortly before relator's trial he had tried a case to a jury on which there sat four or five colored jurors. Moreover, there were at least two Negroes present on the special venire at relator's trial."

█ Actually, whether the presence of a few Negroes on a venire containing many names is evidence tending to prove or to disprove racial discrimination depends upon the proportions of Negroes and whites who are qualified for jury service. Reece v. Georgia, 1955, 350 U.S. 85, 87, 88, 76 S.Ct. 167, 100 L.Ed. 77. Fairness in selection does not require

proportionate representation of races upon a jury venire. Akins v. Texas, 1945, 325 U.S. 398, 403, 65 S.Ct. 1276, 89 L.Ed. 1692. It is nonetheless true that very decided variations in proportions of Negroes and whites on jury lists from racial proportions in the population, which variations are not explained and are long continued, furnish sufficient evidence of systematic exclusion of Negroes from jury service. Brown v. Allen, 1953, 344 U.S. 443, 471, 73 S.Ct. 397, 97 L.Ed. 469. It was there said: "Of course, token summoning of Negroes for jury service does not comply with equal protection, Smith v. Texas, 311 U.S. 128 [61 S.Ct. 164, 85 L.Ed. 84]." In the case cited, Negroes constituted 20% of the population of the County and 10% of the poll tax payers but very few Negroes served on grand juries. The Court commented, "Chance and accident alone could hardly have brought about the listing for grand jury services of so few Negroes from among the thousands shown by the undisputed evidence to possess the legal qualifications for jury service." Smith v. Texas, 1940, 311 U.S. 128, 131, 61 S. Ct. 164, 85 L.Ed. 84.

In Speller v. Allen, decided along with Brown v. Allen, the Court said:

"As we have stated above in discussing the Brown case, [344 U.S.] page 473, [73 S.Ct. 415] et seq., supra, our conclusion that selection of prospective jurors may be made from such tax lists as those required under North Carolina statutes without violation of the Federal Constitution, this point needs no further elaboration. The fact that causes further consideration in this case of the selection of prospective jurors is that the tax lists show 8,233 individual taxpayers in Vance County of whom 3,136 or 38% are Negroes. In the jury box involved, selected from that list, there were 2,126 names. Of that number 145 were Negroes, 7%. This disparity between the races would not be accepted by this Court solely on the evidence of the clerk of the commissioners that he selected names of citizens of 'good moral character and qualified to serve as jurors, and who paid their taxes.' It would not be assumed that in Vance County there is not a much larger percentage of Negroes with qualifications of jurymen. The action of the commissioners' clerk, however, in selecting those with 'the most property,' an economic basis not attacked here, might well account for the few Negroes appearing in the box. Evidence of discrimination based solely on race in the selection actually made is lacking."

344 U.S. at p. 481, 73 S.Ct. at p. 419. Thus, where of those qualified for jury service Negroes constituted 38%, but in the jury box only 7% were Negroes, the Supreme Court held that this disparity between the races would not be accepted. In the present case, Negroes constituted more than 31% of those qualified for jury service but less than 2% of those on the jury rolls, and apparently no larger percentage of Negroes had ever been on the jury rolls, certainly not for the last ten years before Seals' trial.

Not only does the respondent fail to come forward with an adequate justification to explain this long-continued, wide discrepancy between the number of qualified Negroes in the County and their representation on the jury rolls, but the evidence is practically conclusive that the method of selection at the time of Seals' trial and during the preceding years inevitably resulted in systematic exclusion of all but a token number of Negroes from the jury rolls. We conclude that the presence of no Negroes on the 18-man grand jury which indicted Seals, and of 2 Negroes on the venire of 110 persons from which came the petit jury which convicted Seals and condemned him to death was not a mere fortuitous accident but was the result of systematic exclusion of Negroes from the jury rolls.

Left for decision is the question of whether the objection to the grand jury or to the petit jury or to both on the ground of systematic exclusion of Negroes remains open for consideration in

this habeas corpus proceeding. The Alabama Supreme Court was of the opinion that Seals had waived his constitutional rights to insist that members of his race not be systematically excluded because of race from both grand jury and petit jury service when he and his attorney did not make the objection on his trial or on motion for new trial. Ex parte Seals, 1961, 271 Ala. 622, 126 So.2d 474, 475. We do not agree.

■ The general rule has been well stated by the United States Supreme Court that, "The primary purpose of a habeas corpus proceeding is to make certain that a man is not unjustly imprisoned. And if for some justifiable reason he was previously unable to assert his rights or was unaware of the significance of relevant facts, it is neither necessary nor reasonable to deny him all opportunity of 'obtaining judicial relief." Price v. Johnston, 1948, 334 U.S. 266, 291, 68 S.Ct. 1049, 92 L.Ed. 1356.

■ In United States ex rel. Goldsby v. Harpole, 1959, 5 Cir., 263 F.2d 71, 81, this Court pointed out that systematic exclusion of members of an accused's race from a trial jury would involve consequences far more serious than their exclusion from a grand jury. We held that such exclusion from a trial jury would violate the due process clause of the Fourteenth Amendment as well as the equal protection clause. We pointed out the difficulties under which white lawyers labored in raising the objection. In the interest of fundamental fairness, we felt it our duty to take certain judicial notice as follows:

"As Judges of a Circuit comprising six states of the deep South, we think that it is our duty to take judicial notice that lawyers residing in many southern jurisdictions rarely, almost to the point of never, raise the issue of systematic exclusion of Negroes from juries."

263 F.2d at p. 82. In that case we held that the conduct of Goldsby's counsel without consultation with his client did not bind Goldsby to a waiver of his constitutional right to object to the systematic exclusion of members of his race from the trial jury.

The evidence in this case confirms the soundness of that holding. Honorable Carl Booth, who had been the State prosecuting attorney in Mobile since 1943, testified that no motion based on the exclusion of Negroes from the grand jury or the petit jury had ever been made prior to Seals' trial; that one such attack has been made since Seals' trial by a defendant represented by Vernon Crawford, whom the record reveals was a Negro attorney; Mr. Johnson, the attorney who represented Seals on his trial, testified that he had defended many other Negroes for capital crimes, somewhere between fifteen and fifty, but that he never had a Negro as one of the jurors in a capital case in which a Negro was a defendant. He had never attacked the composition of a jury on the ground that Negroes were systematically excluded. Mr. Johnson gave his opinion that no grounds existed for such an attack. But, on cross-examination by Seals' present counsel, Mr. Johnson admitted that he had no knowledge of the evidentiary facts which, as we have held, showed that Negroes were systematically excluded from the juries.[6]

---

6. "Q. Do you know the percentage of Negro population of Mobile?
"A. No, sir, I don't.
"Q. Do you know to what extent members of the Negro race are qualified to serve on the jury?
"A. I sure don't.
"Q. Do you know whether or not the Negroes are any more or less qualified to serve as jurors in Mobile than white persons?
"A. I have no opinion.

\* \* \* \* \*
"\* \* \* In 1955 there were a total of 1294 persons included in the venire for that year, and of that 1295 (sic) there were only 25 Negroes or 1.9 per cent of the total. Were you aware of that fact?
"A. I had no knowledge of that.
\* \* \* \* \*
"Q. Were you aware of the fact that there were only 1.9 per cent Negroes who were included in the venire in 1956?

In a footnote referring to Speller v. Allen, 345 U.S. 946, 73 S.Ct. 827, 97 L. Ed. 1370, decided along with Brown v. Allen, 1953, 344 U.S. 433, 480, 73 S.Ct. 397, 97 L.Ed. 469, on the subject of what objections to the selection of jurors remain open for consideration the Supreme Court said:

"Evidence in state criminal proceedings to support objections on federal constitutional grounds, *known to state defendants and their counsel, or easily ascertainable,* cannot be withheld or neglected at the state trial and used later to support habeas corpus. State criminal proceedings would be unreasonably hampered. Ex parte Spencer, 228 U.S. 652, 660 [33 S.Ct. 709, 57 L.Ed. 1010]; In re Wood, 140 U.S. 278, 285 [11 S.Ct. 738, 35 L.Ed. 505]; Crowe v. United States, [4 Cir.,] 175 F.2d 799; Price v. Johnston, 334 U. S. 266, 289 [68 S.Ct. 1049, 92 L.Ed. 1356], and the dissent." (Emphasis supplied.)

In United States v. Harpole, supra, we held that the objection as to the grand jury was waived. In that case, however, the evidence to support the objection was easily ascertainable and was in fact known to defendant's counsel. In the present case the evidence to support objections to the composition of the jury was entirely unknown to the defendant Seals, who was at no time even consulted by his attorney on this subject. Further, that evidence was not known to the attorney ·who defended Seals. Finally, that evidence was not "easily ascertainable," but has been produced in the hearing of this petition only as the result of unusual and exhaustive investigation by Seals' present counsel.

Under the facts of this case, with all deference to the opinion of the Supreme Court of Alabama, we cannot agree that Seals waived his constitutional rights by failing to object upon his trial and must accordingly be executed. To the contrary, we must hold that the objection both to the grand jury and to the petit jury on the ground that Negroes were systematically excluded is open for consideration on this habeas corpus proceeding.

■ Upon the present record we hold further that Negroes were systematically excluded both from the grand jury which indicted Seals and from the petit jury which convicted him; and, hence, that Seals' judgment of conviction is unconstitutional, subject to collateral attack, and is declared to be void and of no effect.

■ Nonetheless, Seals is now legally detained upon his commitment to await the action of another grand jury upon the crime of rape with which he is charged. Seals is, of course, entitled to be tried within a reasonable time, and the district court should retain jurisdiction to meet the unlikely event that further orders and judgments may be necessary or proper. This Court expresses its present opinion that a period of eight months from and after the entry of this judgment or its final test by certiorari, or otherwise, will be sufficient to afford the State of Alabama an opportunity to take the necessary steps to reindict and retry Seals.

Any such reindictment must of course be by a grand jury from which Negroes have not been systematically excluded, and any such retrial must be before a jury from which Negroes have not been

"A. I was not.

"Q. Were you aware in 1957 there were 2,054 total number of persons included in the venire and that there were only 25 Negroes in the total, about only 1.2 per cent total number of persons on the venire?

"A. I had no knowledge.

"Q. Were you aware in 1958, the year in which Seals was tried, out of 2,030 persons whose names were in the venire that there were only a total of 23 Negroes and of that number there were only 1.1 per cent Negroes?

"A. I had no knowledge.

"Q. Are you aware of the fact in 1958, the year in which Seals was tried, there were no Negroes who served on the Grand Jury of Mobile County?

"A. I had no knowledge."

systematically excluded, or before some court or tribunal so constituted as not to violate Seals' constitutional rights. For the guidance of the parties, the Court expresses the present opinion that if Seals is reindicted and retried and if any question should arise as to the legality or constitutionality of such indictment or trial, that should be decided not upon the present petition but in the regular course by the Courts of the State of Alabama, subject to possible review by the Supreme Court of the United States.

The judgment of the district court is reversed, judgment here rendered in accordance with the holdings of this opinion, and the cause remanded for any further proceedings which may be found necessary or proper.

Reversed, rendered, and remanded.