**R. B. (Bud) FORD, Petitioner,**

**v.**

**W. I. HOLLOWELL, acting Superintendent, Mississippi State Penitentiary, Respondent.**

**No. WC 73–41–K.**

United States District Court,
N. D. Mississippi, W. D.

Dec. 5, 1974.

Rex F. Sanderson, Houston, Miss., for petitioner.

Timmie Hancock, Asst. Atty. Gen., Jackson, Miss., for respondent.

## MEMORANDUM OPINION

KEADY, Chief Judge.

At the September 1968 term of the Calhoun County, Mississippi, Circuit Court, R. B. (Bud) Ford was tried for the murder of his wife, Virgie Ford, convicted of the lesser included offense of manslaughter, and sentenced to a term of 20 years in the Mississippi State Penitentiary. Prior to trial, Ford moved to quash the indictment against him, alleging that members of his race, i. e. Negro, had been systematically excluded from the grand jury which indicted him. This motion was denied by the trial court. Upon his conviction, Ford prosecuted an appeal to the Supreme

Court of Mississippi, again protesting that the indictment returned against him was void owing to racial discrimination in the selection of the grand jury. The only factual support offered on this issue in the appeal to the state appellate court was a showing that although the county population was approximately 35% black, "there were no Negroes on the [75 person] venire from which the grand jury was selected that returned the indictment against him. . . . Appellant made no effort to show that there had been long continued practice of omission of Negroes from jury service in this county." Ford v. State, 227 So.2d 454, 456 (Miss.1969). Noting that exclusion on account of race cannot be established solely on evidence of an absence of blacks on a particular grand or petit jury, the state supreme court affirmed the conviction.

Now Ford has initiated this habeas corpus proceeding [1] under 28 U.S.C. § 2241 et seq., renewing his contention that his conviction was invalid because based on an indictment rendered by a grand jury from which blacks were systematically excluded. · Other issues here raised by the petitioner were disposed of by this court in a Memorandum Order of October 12, 1973. Pursuant to that order, counsel was appointed for petitioner and a report was submitted by the United States Magistrate after a preliminary hearing. On December 3, 1974, the court conducted an evidentiary hearing to determine whether racial discrimination by the State of Mississippi or its official agents did systematically exclude blacks from petitioner's grand jury and thus deny Ford his Fourteenth Amendment rights.

At the hearing, highly significant facts were adduced by stipulations of counsel and oral testimony. The present record thus presents a far different picture than that heretofore portrayed in the state courts.

In 1960, the adult male population of Calhoun County consisted of 3,486 whites (80.49%) and 845 blacks (19.51%).[2] By 1970, this racial composition had altered only minutely, with 3,413 adult white males (81.28%) and 786 (18.72%) adult black males residing in the county. In 1968, the year in which petitioner was tried, the adult male population was composed of 3,427 whites (81.11%) and 798 blacks (18.89%).

In sharp contrast is the racial composition of jurors during that period. From 1960 through 1968, 1520 citizens were summoned as veniremen for jury duty in the circuit court. Of that number only 62, or 4.08%, were black. Prior to September 1964, no blacks served as jurors in the county. From 1965 through the term of petitioner's trial in 1968, blacks comprised 7.14% of the circuit court veniremen. No master jury lists for Calhoun County are available for the years 1960–66. However, the master lists, from which the veniremen are selected, contained in 1967 and 1968 the names of 13 blacks, or only 2.47% of all citizens on the master jury lists for those years. These consistent and serious disparities may be explained once Calhoun County's jury selection procedure is understood. In 1968 and prior years, the names of citizens selected for jury duty were taken exclusively from the rolls of registered voters.

According to the testimony of the county officials, the names of prospective jurors were annually culled from the voter registration lists in a three-step process. First, the circuit clerk chose every eighth name appearing on the alphabetized voter registration rolls.

---

1. Jack K. Reed, present superintendent of Mississippi State Penitentiary, is substituted as respondent in the place of his predecessor, W. I. Hollowell, pursuant to Rule 25(d), F.R. Civ.P.

2. In 1968, the year in which criminal proceedings against petitioner were instituted, only adult males were eligible to serve on grand and petit juries in Mississippi. Miss. Code Ann. § 1762 (1942). Jury eligibility has now been extended to women. Miss.Code Ann. § 13–5–1 (1972).

Only where a person selected was recognizable to the clerk as one who, for some reason, could not serve would this procedure be varied; in that case, the person thought to be exempt was passed over and the next succeeding name selected. The process, which was applicable to each supervisor's district, would then continue on to the next eighth name. The circuit clerk stated that the registration records contained no indication of the race of the voters and that personal or racial considerations played no part in this initial stage of selection. Secondly, the circuit clerk transmitted the completed list of 250 to 300 names thus selected from each district to the county board of supervisors, who then picked names from the list. The supervisors' selections in each district appear to have been accomplished by a random method, with the personal discretion of a supervisor being exercised where the random process might reveal the name of one who was known to the board as a person who would not or could not serve. By this method, the list was reduced to about 100 names for each district. The revised list, known as the master jury list, was then returned to the circuit clerk, who placed the names contained on the list into jury boxes. Finally, approximately 10 days prior to the beginning of a court term, the sheriff, chancery clerk, and circuit clerk met and drew blindly from the boxes the names of prospective jurors or veniremen, in the numbers directed by the circuit judge.

Although the stated procedure left room for subjective and potentially discriminatory judgments by county officials, we find no evidence of racial discrimination in the selection of names by the officials. It is clear that the underrepresentation of blacks on Calhoun County juries at the time of petitioner's conviction was due, not to any subjective conduct or bad faith by individual officials, but to a fatal weakness in the selection vehicle itself. The parties agree that, in 1968, black males registered to vote constituted only .5% to 1.5% of the total male voting population of the county. Thus, at every stage of the jury selection process, blacks were spectacularly underrepresented in the universe of potential jurors. Given this imbalance in the selection vehicle, a statistically flawless random selection of the type described by the county officials would have resulted in a master jury list approximately 1% black—not far from the actual 2.47% figure present on the 1967–68 master list.

Both sides presented the court with evidence relating to the reasons why adult black males, who constituted almost 19% of the county's 1968 population, made up no more than 1% of the registered voters. The circuit clerk testified without contradiction that after the passage of the Voting Rights Act of 1965, blacks suffered no official impediment in voter registration. Black citizens testified, however, that the general feeling within the black community, even after 1965, was one of continuing fear and apprehension by blacks in attempting to register to vote. They stated that accordingly small success was achieved in the 1965–68 era in organized efforts in Calhoun County to get blacks to register. These feelings of repression, engendered from past racial discrimination, were reinforced by various contemporaneous incidents, such as the night burning of two Negro churches and several cross-burnings on a single night, in the courthouse yard at Pittsboro, in the town square at Calhoun City, and at Bruce and elsewhere. Also, there were several incidents of shooting into houses. Knowledge of these events spread throughout the black community, which requested FBI agents to join local officers in investigations. Although never solved, the incidents were commonly regarded as harassments of blacks who sent their children to the formerly all-white public schools or who engaged in voter registration or other civil rights activity. The court finds from this evidence that the failure of black males to register in greater numbers was due, not to disinterest in government affairs,

but to their fear, anxiety, and apprehension for safety. The credible testimony is that blacks were eager to register and vote, but were deterred by what they reasonably perceived to be acts of hostility and intimidation. The lack of black voter registration, after the passage of the Voting Rights Act of 1965, may not be ascribed in any manner to official discrimination, intimidation or coercion. Nevertheless, the extent of black underrepresentation on the registration rolls, in relation to the adult male population, was known to, or readily ascertainable by, the county officials when they compiled the master jury lists in the 1960–68 period.

Two issues are presented for resolution. First, has petitioner sufficiently exhausted his state remedies so that consideration of federal habeas corpus relief is now appropriate? Second, if exhaustion has occurred, do the facts reveal an unrebutted prima facie case of racial discrimination in jury selection sufficient to justify setting aside petitioner's conviction?

 Federal habeas relief may not be granted to overturn a state criminal conviction until the petitioner has exhausted available state remedies. 28 U. S.C. § 2254; Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). It is equally fundamental that where, as here, the petitioner has presented his federal claim both to the trial court which convicted him, and again to the highest state appellate court on direct appeal from his conviction, state remedies have been exhausted for purposes of that federal claim. Brown v. Allen, 344 U.S. 443, 447–450, 73 S.Ct. 397, 97 L.Ed. 469 (1953). See Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971); Bartz v. Wainwright, 451 F.2d 663 (5 Cir. 1971). Since petitioner did present to the state courts the precise issue of racial jury exclusion he seeks to litigate here, under traditional notions petitioner would clearly have exhausted his state remedies. The problem in the present case lies not in any differences in the legal issues

presented to state and federal tribunals, but in significant differences in the supporting evidence. When petitioner presented his Fourteenth Amendment contentions to the state courts, he supported his arguments only by a showing that the grand jury which indicted him was devoid of black representation. In this federal court, however, petitioner has buttressed his claims with cogent evidence of consistent, long-continued underrepresentation of blacks on Calhoun County juries. Should the presentation of this additional evidence force petitioner to return to the state courts for further evaluation? We think not. As the Supreme Court has made clear, federal courts in habeas corpus proceedings are not bound by the evidentiary record made in the state courts; and when state court proceedings have yielded an inadequate factual record, federal courts may seek out additional evidence to insure vindication of the petitioner's constitutionally protected rights. Fay v. Noia, supra; Rogers v. Richmond, 357 U.S. 220, 78 S.Ct. 1365, 2 L. Ed.2d 1361 (1958). Indeed, the federal judiciary is often required in habeas proceedings to consider and act upon evidence which was unavailable or not presented to the state courts. See 28 U.S. C. § 2254(d); Townsend v. Sain, 372 U. S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). Thus, the availability of additional evidence, as contradistinguished from the raising of new constitutional issues, does not defeat an otherwise valid claim that state remedies have been exhausted. It is enough that the issue was identified with particularity and addressed by the State Supreme Court, albeit upon a limited factual record. We conclude, therefore, that petitioner has exhausted his state remedies and that this court may entertain his substantive constitutional claim.

 There are well-established constitutional principles which relate to racial discrimination in jury selection. A state court conviction based on the indictment of a grand jury or the verdict of a petit jury from which blacks

have been systematically excluded violates the Equal Protection Clause of the Fourteenth Amendment and cannot stand. Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1880); Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967). Further, the presence of a token number of blacks on the jury rolls is equally offensive to the Constitution; rather, the jury lists must reasonably reflect "a cross-section of the population suitable in character and intelligence for that civic duty." Brown v. Allen, 344 U.S. 443, 474, 73 S.Ct. 397, 416, 97 L.Ed. 469 (1953). A criminal defendant, however, possesses no constitutional right to a grand or petit jury which contains a proportionate number of members of his own race. Swain v. Alabama, 380 U.S. 202, 208, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). Nor is there a constitutional right to be tried by members of one's own race, only a right not to have members of any race systematically excluded from the grand and petit juries. Akins v. Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945). Thus, the proper focus, in jury discrimination cases, is on the source list from which the jury is chosen, and not on the composition of any particular jury. Rabinowitz v. U. S., 366 F.2d 34, 59 (5 Cir. 1966).

■■■■■ The burden of proving racial discrimination rests upon the petitioner in a habeas corpus proceeding and, where the underrepresentation by blacks is not extremely disproportionate, this burden can be a heavy one. Swain v. Alabama, supra; Labat v. Bennett, 365 F.2d 698 (5 Cir. 1966). Yet, where the evidence shows a dramatic and long-continued underrepresentation of blacks on juries, either by their complete absence or spectacular underrepresentation, "the courts have read the figures as establishing a prima facie case of purposeful discrimination on the theory that discrimination against Negroes is the most reasonable explanation for the composition of the jury system under scrutiny." U. S. v. Hyde, 448 F.2d 815, 825 (5 Cir. 1971); Billingsley v. Clay-ton, 359 F.2d 13 (5 Cir. 1966). When such a prima facie case is made out, the burden shifts to the prosecution to justify such exclusion as having been brought about by reasons other than racial discrimination. Whitus v. Georgia, supra; Patton v. Mississippi, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76 (1947).

■■■■ In the case sub judice, it appears that prior to September 1964, no blacks served on the juries in Calhoun County and that thereafter there was no more than token inclusion of blacks on the available master jury lists and serious underrepresentation of blacks called as veniremen. Taking the more favorable figure of 7.14% blacks on the venire lists, it appears that blacks were 63% underrepresented in relation to the total number of jury-eligible blacks (19%). Stated another way, to overcome the underrepresentation there should have been 2.7 times as many blacks called as veniremen as were called in 1968 and prior years. See *Rabinowitz,* supra, 366 F.2d at 56, n. 55. An underrepresentation of this magnitude, which was long continued, is sufficient to raise a prima facie case of racial discrimination which the respondent has a duty to rebut with a constitutionally acceptable explanation.

No evidence was adduced that adult black males in Calhoun County lacked educational or other qualifications of law for jury service. Presumptively, they were qualified to serve. The only explanation for the underrepresentation of blacks is their corresponding underrepresentation on the list of qualified electors. Thus, the issue is raised whether the prima facie case of racial discrimination is rebutted by the fact that the jury selection officials used the voter regulation lists in random selections as the sole source of prospective jurors.

Conceding that the voter registration rolls are racially disproportionate, respondent nevertheless contends that the paucity of registered black male voters in 1968 and prior thereto was not due

to purposeful discrimination by government officials, but to the decision of blacks who did not choose to register to vote. Respondent relies upon a series of Fifth Circuit cases[3] which hold that a group of persons who failed to register to vote may not be considered as a "cognizable group" to whom the protection of the Fourteenth Amendment extends. We find these holdings to be here inapplicable, for in those cases there was no showing that the voter registration lists used as the source of names for prospective jurors were not a fair cross-section of the community. In *Grimes,* the Court expressly found that the registration list did produce an array of federal court jurors who were "a representative cross-section of the community. . . . There was no showing that the use of these [voter registration] lists resulted in the exclusion of a 'cognizable group or class of qualified citizens.'" 391 F.2d at 709. *Grimes* did not involve an exclusion because of race; indeed, no effort was made to identify the excluded group. In *Camp* as well as in *Dangler,* the use of voter registration lists as the sole source of prospective jurors was held constitutionally permissible since the method was found not to result in the systematic exclusion of a "cognizable group or class of qualified citizens." In declaring that those who choose not to register to vote may not be considered a cognizable group, the Fifth Circuit applied the principle against the claim that Jehovah's Witnesses were excluded because they refrain from registering to vote because of religious conviction. No claim of racial exclusion was involved in *Camp* or *Dangler,* and in neither case did the Court find that a fair cross-section of the community was lacking. Ford v. White, which is strongly relied on by respondent, was a class action which sought to eliminate future racial discrimination in jury selection, not a federal habeas corpus proceeding.

It is true that in denying injunctive relief the district court did apply the "lack of a cognizable group" rule to blacks in Issaquena County who failed to register to vote. On appeal, the Fifth Circuit, however, did not mention the "cognizable group" standard, but held the trial court's refusal to grant injunctive relief was not error since the registration of blacks in the county was steadily rising and all Negro males, as soon as they were registered, were placed on the jury lists, thus bringing the representation of blacks on jury lists to within 9% of the county's adult black population.

In no case has the Fifth Circuit applied the failure-to-register doctrine where the voter registration lists failed to produce a fair cross-section of the community or where blacks were spectacularly underrepresented on the voter rolls. Here, the non-registered groups are readily identifiable blacks who constitute a substantial portion of the jury-eligible population and whose failure to register was induced by fear and not by voluntary choice. We think that it would be shockingly unfair for a court to refuse to consider such persons as cognizable under Fourteenth Amendment standards.

Respondent also urges there is no showing that black males in Calhoun County failed to register because of official coercion, intimidation or repression and, therefore, the use of voter registration lists as the source of jurors did not constitute purposeful discrimination. It is not necessary, however, to a finding of discrimination that the officials acted without good faith, for objective results largely govern in judging the constitutionality of jury selection methods. Whatever the jury selection plan, whatever the intent with which it is implemented or executed, if it results in a long-continued exclusion or dramatic underrepresentation of blacks on the jury lists, it is constitutionally in-

3. Grimes v. U. S., 391 F.2d 709 (5 Cir. 1958); Camp v. U. S., 413 F.2d 419 (5 Cir. 1969); U. S. v. Dangler, 422 F.2d 344 (5 Cir. 1970); and Ford v. White, 299 F.Supp. 772 (S.D.Miss.1969), aff'd 430 F.2d 951 (5 Cir. 1970).

firm. Eubanks v. Louisiana, 356 U.S. 584, 587, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958); U. S. ex rel Seals v. Wiman, 304 F.2d 53, 65 (5 Cir. 1962); Billingsley v. Clayton, supra; Salary v. Wilson, 415 F.2d 467 (5 Cir. 1969).

■ According to the evidence, blacks failed to register in substantial numbers, despite the passage of the Voting Rights Act of 1965, because of continuing fears and apprehensions which they harbored in connection with efforts to exercise rights of citizenship, including registration to vote; their inaction was not because of disinterest in government. The county officials charged with jury selection knew or had the means of knowing that the voter registration lists failed to be representative of adult black males. Armed with this knowledge, the officials having the task of selecting jurors to serve in Calhoun County in 1968 were under an affirmative duty to utilize a selection method which had the potential for yielding juries which represented a fair cross-section of the qualified citizens of the community. "If a fair cross-section is consistently lacking, then, without more, it is established that the [jury] commissioners have failed in their duty." *Rabinowitz*, 366 F.2d at 58. Brooks v. Beto, 366 F.2d 1 (5 Cir. 1966); U. S. v. Henderson, 474 F.2d 1098, 1101 (5 Cir. 1973).

To fulfill that duty, they—the Board of Supervisors and the Circuit Judge—were obligated to use every means legally available. This included a resort to the county land rolls as an additional source of qualified Negroes, as authorized by Miss.Code Ann. § 1762–01 (Supp.1966). This statute, enacted in 1964, provided an alternative jury source, on order of the circuit judge, for including resident freeholders of the county, otherwise qualified to serve on juries though not registered to vote, on venire lists. Its use was approved in Black v. State, 187 So.2d 815 (Miss. 1966), as a lawful means for achieving a constitutional method of jury selection because of the failure of blacks to register to vote in Chickasaw County.

In our view, respondent fails to rebut the prima facie case of discrimination presented by petitioner, and his conviction should be set aside.

Accordingly, a writ of habeas corpus shall be granted.