**UNITED STATES of America,**

**v.**

**Peter Columbus CURRY, Jr., Defendant.**

**62 CR 209.**

United States District Court
E. D. New York.

Nov. 26, 1963.

774

Myron Beldock, New York City, for defendant, for the motion.

Stephen Lowey, and Joseph V. Costa, Brooklyn, N. Y. (Joseph P. Hoey, U. S. Atty., of counsel), for the United States, opposed.

DOOLING, District Judge.

The exhibits involved are the first statement of February 13, 1962, Government Exhibit 80 for identification at this trial (which is copied in Ex. 68 at the last trial) and defendant's Exhibits CH 2–A and 2B of this hearing and also, from the last trial, the following Government Exhibits 64 (67) dated February 15, 1962; Exhibit 63 (70) dated February 16, 1962; and Exhibit 65 (71) dated February 21,.1962; the foregoing are statements signed by defendant Curry and the directly related FBI agent's reports incorporating the statements; in addition there is a quasi-statement dated March 6, 1961, that is unsigned and a related report (Government Exhibit 66 [72]) and there are interview reports in addition, Government Exhibits 62, 69, 75 and 78 giving the content of interviews with defendant Curry on February 14 and 16 and March 6 and 7, 1962.

█ It is concluded that none of the statements of Curry, written or oral, reflected in the Exhibits listed may be used in evidence against defendant Curry on the Government's case and that any use made under Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 must be limited as indicated in Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 and in Lockley v. United States, 1959, 106 U.S.App.D.C. 163, 270 F.2d 915, 919; see also Smith v. United States, 1962, 114 U.S.App.D.C. 140, 312 F.2d 867, 870–871.

On a complaint sworn to on the evening of February 12, 1962, two months after the robbery, a warrant issued directing the apprehension of Curry and that he be brought forthwith before the Commissioner who issued the warrant or some judge of the United States. Curry was arrested at the home of his mother and stepfather when he reached there, after a night-time bus trip from Washington, D. C., at 4:50 A.M. on the morning of February 13, 1962. The only money he had was 10 cents. He was warned that he need not make any statement, that those he did make could be used in a court of law and that he had a right to consult a lawyer. He was then promptly taken to F. B. I. headquarters on 69th Street in Manhattan, thoroughly searched, offered toilet facilities and again warned that he had a right to an attorney, that he did not have to make any statements, that any he made could be used against him in a court of law and that he could consult an attorney. Curry said he did want a lawyer and was told to use the telephone, which was made available to him. He then said he did not know an attorney. The matter apparently was dropped with that. Curry was given a pack of cigarettes and at about a quarter to six the agents commenced to interview Curry. Until about a quarter to ten Curry, questioned first, and elaborately, about his background, then about his associates and then about Wilcoxson and Nussbaum and his associations with them in and after he was in prison with them at Chilicothe, steadfastly denied any involvement in or knowledge of the Lafayette Bank robbery and killing. At a quarter of ten, when he returned from being taken to the photographer and to the men's room, Curry was in the course of stating that he knew about the robbery and by about 10:00 had said that he participated in it. The writing, reading, changing and signing of Curry's statement took from sometime after 10:00 A.M. until 11:18. Curry was not without food; he seemingly took coffee three times and twice rejected food. Curry was taken to the U. S. Attorney's office and arrived there at about noon. There he talked privately with his mother for some time in the room and presence of an Assistant United States Attorney, who was seated well out of earshot.

Meanwhile, the Commissioner had been advised during the morning of Curry's apprehension and had indicated that he would be available at 12:30 or 1:00 P.M. Curry was taken before the

Commissioner at 1:00. He was duly warned again and stated that he desired counsel; he rejected a reference to the Legal Aid Society and his case was adjourned for all purposes, then and on later dates, to enable him to get counsel. Although one lawyer, Carson Dewitt Baker, visited Curry in jail on March 5 (before the last two F. B. I. interviews) and another, Louis Kaye, visited him on March 19 and put in an appearance for Curry on March 21, 1962, Curry's representation was not settled until Mr. Beldock was assigned to represent Curry by the Court on June 14, 1962.

At all the times when the F. B. I. agents interviewed Defendant Curry, defendants Wilcoxson and Nussbaum were at large, were (as their later pleas of guilty to the present and a number of other bank robbery indictments indicate) men whom the F. B. I. was deeply and properly concerned to locate and arrest, and, apparently, they committed further bank robbery after defendant Curry's arrest. The questioning of defendant Curry on the morning of February 13 and after his incarceration at West Street included substantial questioning directed to accumulating data on Wilcoxson and Nussbaum and locating them.

The statements of Curry made after his jailing are only in part directly inculpatory. Curry was, and stated during his jailing that he was, desirous of having the assistance of counsel. The inculpatory statements taken from him when he was unwillingly unrepresented and held without bail pending an indictment not found until June 13, 1962, four months after his arrest, cannot be used against him. To permit it would be to reduce the constitutional promise of the assistance of counsel to empty form. Few men are ever more vulnerably parties to a more gravely menacing proceeding than was Curry. Curry's need of counsel was absolute and exigent. It was a known need. The inculpatory statements taken when he was unrepresented may not be read against him on

the Government's case. People v. Meyer, 1962, 11 N.Y.2d 162, 227 N.Y.S.2d 427, 182 N.E.2d 103 applies an essentially federal constitutional principle. Lee v. United States, 5th Cir. 1963, 322 F.2d 770, though it excluded post-indictment interviews, cannot be differentiated without denaturing the constitutional principle it invokes as controlling. See Anderson v. North Carolina, W.D.N.C.1963, 221 F.Supp. 930. White v. Maryland, 1963, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed. 193 most recently reiterated the constitutional right to have counsel on an occasion when a damning admission may be drawn by proper judicial inquiry. United States v. Massiah, 2d Cir. 1962, 307 F.2d 62 deals with too different a context to suggest that People v. Meyer, supra, will not be accepted as correct.

█ It is noted that if the February 13 statement was illegally obtained, the later inculpatory statements would, independently, be excludible as derivative from the original statement in view of the short interval of time and the absence of any intervention by counsel.[*] Killough v. United States, 1962, 114 U.S. App.D.C. 305, 315 F.2d 241.

The statement taken on the morning of the arrest (defendant's Exhibits 80 for identification, and CH 2A and 2B and Exhibit 68 at the last trial) has been challenged as coerced in fact, as illicitly obtained under the *McNabb-Mallory* rule because defendant was detained too long before being taken before the Commissioner as required by Rule 5(a) and as illicitly obtained because Curry asked for and did not get counsel; the last point is put as a specification, as it were, under the charge of coercion.

█ In the inevitable and necessarily unequal contest of general credibilities (Cf. dissenting and concurring views expressed in Muschette v. United States, 1963, 116 U.S.App.D.C. 239, 322 F.2d 989, 992–993; Killough v. United States, 1962, 114 U.S.App.D.C. 305, 315 F.2d 241, 249) defendant Curry does not

---

[*] It is, no doubt, barren coincidence that no statement was signed after a lawyer visited Curry on March 5, 1962.

prevail. Elements of his complex testimony tax credulity. The agents' and the detectives' testimonies are somewhat soft at one possibly critical point (Tr. 1868–1872; compare Tr. 2254 to 2259; 2433–2443)—the events of the interlude during which Curry was photographed and went to the men's room—and it is disturbing that the agents entirely omitted reference to Detective Rostow's presence. But it is not found that the broad if somewhat strange threats of action that would jeopardize his mother's status as a foster-parent and as custodian of Curry's own child and that would disturb inexplicably the relation between his mother and stepfather by disclosing that the young girl in the Boyd house was not kin to Mrs. Boyd,—it is not found that the threats were made although the matters may have been of some belated concern to defendant Curry at the time. It is not found that explicit promises of intercession on the matter of sentence were made or any inducement in the way of an assurance that his sentence would not exceed ten years (Compare Tr. 1836 with Tr. 2224, 2242). Nor is it found that Detective Rostow's testimony, on reopening, and his notes (Defendant's Exhibits CH 2–A, 2–B) support Curry's credibility and his testimony that he quit the robbery in and after the abortive effort of December 8; it is inviting to speculate that Defendant's Ex. CH 2–A in saying "States he didn't go on the job with Bob" supports Curry, but Rostow declined to say that and they were his notes; if speculation were in order, other modestly possible ones are that it means the December 8 job was called off (as it was) though all three were in position or that the note means that on December 8 "he [Curry] didn't go on the job [i. e., did not enter the bank] with Bob—Al there [i. e., in the bank with Wilcoxson] also"; that is what Curry claims occurred on December 8; but all this is speculation in the teeth of the fact that Rostow did not testify to any recollection that supported Curry's story.

Physical force or specific promises are not found to have overcome defendant's Curry's will. But he was nonetheless "told" to "cooperate" and one agent said, in substance, "Be truthful and you will be better off" (Tr. 2224). That was not elaborated but, the agent said, "He seemed to realize what I meant" (Tr. 2224). Yet if the agent supposed Curry guilty and that the truth would condemn him, what could the agent have meant by what he said if not that punishment would be materially mitigated if he "confessed"? Yet it was said that the penalty for the crime was not discussed (Tr. 2242). Curry could hardly be better off for telling the truth unless he was innocent (which the agent could not have supposed) or unless Curry meant in the end to plead guilty. The difficulty is that once he spoke, his position was irrecoverable. He was worse off than the defendant who is permitted to withdraw a guilty plea. Kercheval v. United States, 1927, 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009; see Annotation (1942) 141 A.L.R. 1318.

It is agreed ground that Curry said he wanted a lawyer and then admitted that he did not know one to call and that then the questioning went on. It is found that a substantial part of the time was spent on getting biographical and background data on Curry himself and in getting data on Wilcoxson and Nussbaum. That these topics were readily separable from or separated from the rest of the interviewing is not found. It is found that a primary objective of the interrogation was to obtain from Curry admissions of his guilty involvement and a confession if possible. There is no evidence and it is not found that a purpose of the session was to verify in any other way the data already in hand or to obtain and immediately run down leads that would inculpate or exculpate Curry before further proceedings were taken.

On all the facts it is concluded that Curry's statements of February 13, 1962, were illegally obtained because, *first* he sought counsel, he exigently needed counsel, and the interrogation was nevertheless continued

without according him counsel's advice; the "warning" was given but when its most critical element was wisely invoked—by a statement that the assistance of counsel was desired—it was not implemented; *second,* the interrogation exceeded the limits proper to an occasion the limits of which are prescribed by the *McNabb-Mallory* rule and Rule 5(a) in going beyond the immediate needs of police administration and seeking, in the absence of defense counsel, evidence from the defendant himself for use both to secure an indictment and to prove its allegations; and, *third,* the interrogation took place during a detention illegally protracted in violation of Rule 5(a) and the *McNabb-Mallory* rule. "Once a person is arrested he becomes clothed with the right to have the basis for his arrest inquired into by a magistrate." Killough v. United States, 1962, 114 U.S. App.D.C. 305, 315 F.2d 241, 247. The difficulty of finding a Commissioner, judge or magistrate is unreal and, if it existed, it would not provide a ground for protracting the interrogation. Mitchell v. United States, 1963, 114 U.S.App. D.C. 353, 316 F.2d 354, 356–357. While the nature and purpose of the interrogation and the total circumstances of the detention during which it occurs are decisive of legality and not time alone, the duty to take the prisoner before a Commissioner, judge or magistrate is one that must be performed very promptly in the absence of complicating circumstances that properly require a delay, and in no circumstances is the seeking of a confession as such a proper ground of delay. Cf. Jackson v. United States (and related cases) 1962, 114 U.S.App.D.C. 181, 313 F.2d 572, 575–576, 579; Coleman v. United States, 1963, 317 F.2d 891, 115 U.S.App.D.C. 191; United States v. Kehyaian, S.D. N.Y.1962, 30 F.R.D. 544; Ralph v. Pepersack, D.Md.1963, 218 F.Supp. 932. The convergence upon the *McNabb-Mallory* rule of the sharpened emphasis on the importance of having the assistance of counsel at every important stage of the case, certainly in a case

in which a complaint has been made and a warrant for apprehension issued, requires the conclusion that Rule 5(a) admits of no delays for the purpose of interrogating unrepresented defendants, who have not waived the right to counsel, for the general purpose of securing evidence against them.

It is not considered that the Rostow testimony decisively alters the corpus of evidence. In view of the nature of the issues involved, the case is thought to be within Dictograph Products Co. v. Sonotone Corp., 2d Cir. 1956, 230 F.2d 131.

Accordingly, on defendant Curry's objection to Government Exhibit 80 for identification and on the hearing record it is

Ordered that the objection is sustained and the use of any of the exhibits identified in the first paragraph above is suppressed.