UNITED STATES of America,
Appellee,

v.

Peter Columbus CURRY, Jr., Defendant-
Appellant.

No. 365, Docket 29000.

United States Court of Appeals
Second Circuit.

Argued March 4, 1965.

Decided Dec. 22, 1965.

As Modified on Rehearing April 11, 1966.

Hays, Circuit Judge, dissented.

Jerome C. Ditore, Asst. U. S. Atty., Eastern Dist. of New York (Joseph P. Hoey, U. S. Atty., Eastern Dist. of New York, Brooklyn, N. Y., on the brief), for appellee.

Walter R. Mansfield and Robert F. Morten, New York City (Peter W. Mitchell and Roger J. Hawke, New York City, on the brief), for defendant-appellant.

Before LUMBARD, Chief Judge, and MOORE and HAYS, Circuit Judges.

LUMBARD, Chief Judge:

Peter Columbus Curry's appeal from his conviction by a jury in the Eastern District of New York for bank robbery, in the course of which one of his fellow-robbers shot and killed a bank guard, and from his sentence to life imprisonment, raises four questions: (1) Whether it was error to allow the government to use, for the purpose of impeaching contrary testimony given by Curry in his own defense, Curry's statements made to FBI agents prior to his arraignment, which statements had been suppressed from use by the government as direct evidence; (2) Whether or not 18 U.S.C. § 2113(e), which leaves to the jury whether a defendant found guilty of felony-murder should suffer the death penalty, as applied in the instant case is repugnant to the Fifth Amendment; (3) Whether the method of selecting the jury panel was in violation of Curry's rights because it systematically excluded Negroes from the panel; and (4) Whether the district court erred in denying, after a hearing, a motion for a new trial in which defendant alleged that one government witness had recanted and that the testimony of another government witness could be materially impeached. We find all these allegations of error to be without substance and affirm the conviction.

Curry was first tried before Judge Matthew T. Abruzzo and a jury, but the Judge's illness caused a mistrial during the government's case. A second trial, conducted from November 4 to December 22, 1963, before Judge John F. Dooling, Jr., resulted in the judgment of conviction for violation of 18 U.S.C. §§ 2, 371, 2113(a), (d) and (e) from which Curry appeals.

The government's proof amply supports the jury's verdict that Curry was guilty of participating in the robbery of $32,763.43 in cash from the Lafayette National Bank in Brooklyn on the morning of December 15, 1961, together with Albert Frederick Nussbaum and Bobby Randell Wilcoxson, who shot and killed a bank guard.

Curry, Nussbaum and Wilcoxson had met several years prior to 1961 while serving sentences at the Federal Reformatory in Chillicothe, Ohio. When Curry was released from a Georgia prison in October 1961, he visited Nussbaum in Buffalo, using money Nussbaum had sent him. He later came to Brooklyn, where Nussbaum continued to send him money. Wilcoxson joined Curry in New York and the two drove around Long Island searching for a likely bank to rob. Nussbaum came to New York and, commencing November 24, 1961, all three talked about robbing a bank. They finally fixed upon the Lafayette Bank at Utica Avenue and Kings Highway, Brooklyn. The trio made observations regarding the layout of the bank, the movement of its employees, and the delivery of money to it, and they planned their disguises and a getaway route. They also stole an Oldsmobile for a getaway car.

Nussbaum and Wilcoxson picked up Curry near his home at 7:00 A.M. on December 15, and Nussbaum attached a black crepe hair moustache to Curry's upper lip. Curry and Wilcoxson went to the bank in the Oldsmobile; Curry put on a red corduroy cap and took two revolvers from the supply of weapons Nussbaum had provided. Nussbaum parked across the street from the bank in his Ford station wagon, which was equipped with a walkie-talkie transmitter and receiver. Wilcoxson, wearing a raincoat and dark glasses, entered one bank entrance and killed the bank's armed guard with four shots from a Thompson .45 calibre submachine gun. Curry came in from another entrance, cowed the tellers with two loaded revolvers and scooped up cash in two of the tellers' booths. Despite a gun battle with a uniformed policeman,

Wilcoxson and Curry escaped out the Utica Avenue exit to the Oldsmobile and sped away. By means of the walkie-talkie Nussbaum picked them up when they abandoned the Oldsmobile. Nussbaum and Wilcoxson went back to Buffalo and Curry returned to his Brooklyn home. Later Curry received part of his one-third share of the $32,000 loot.

Nussbaum and Wilcoxson, both white, pleaded guilty and testified in detail to the part played by Curry, a Negro, in the planning and execution of the robbery. Several other witnesses identified Curry as the Negro with the two revolvers. In addition, Valerie Brunner, who had been Curry's fiancee at the time, testified that Curry admitted that he helped rob the bank and gave other testimony corroborating Curry's contacts with Wilcoxson shortly before the robbery.

When Curry testified, he admitted his relationship with Wilcoxson and Nussbaum and his participation in the planning of the robbery and in an abortive attempt to rob the same bank on December 8. He even admitted meeting Wilcoxson and Nussbaum on the morning of December 15, but he said that a Negro named "Streets" was with them and that he, Curry, left them at 7:30 A.M. and did not go to the bank. Curry also named three others, Robert Martin, Deroy Pettit and Fred Cunningham, who he said took part in the planning of the robbery.

### I. Curry's Statements to the FBI.

Arrest warrants for Curry, Wilcoxson and Nussbaum were secured from United States Commissioner Shiffman between 6:00 and 7:00 P.M. on February 12, 1962. Agents Long and Putz of the FBI, accompanied by New York City Detective Lesson, arrested Curry at the home of his mother and stepfather in Brooklyn when he arrived there from Washington, D. C., at 4:50 A.M. on February 13, 1962. Curry was warned that he need make no statement, that what he said could be used, and of his right to consult a lawyer. Agent Foley joined them minutes later. It took a few minutes to get to the agents' car, and thirty-five minutes to drive to

FBI headquarters at 201 East 69th Street, Manhattan, where they arrived at about 5:30 A.M.

Curry was brought immediately to a ten by twelve foot interviewing room containing two desks, four or five chairs, one filing cabinet, and one window facing east opposite the door. The room was occupied by Curry, Agents Foley, Putz and Keefe, and Detective Lesson.[1] Curry was immediately "strip-searched"; he disrobed completely and all his belongings were given a thorough examination. He then dressed. After the search and before Curry made any statement, Agents Foley and Putz again advised him that he need make no statement, that anything he said could be used in a court against him, and that he could have legal counsel. Curry replied that he wanted to call a lawyer and that he had a lawyer. Foley offered him the use of a telephone on the desk, and Curry then replied, "I don't have an attorney."

The first forty-five minutes of the interview centered around Curry's background: his parents, family, schooling, and personal history. Agent Foley was the only one to question. At 6:32 A.M. Curry was served coffee.

The interview then turned to the bank robbery itself. Foley explained why they thought that Curry had been involved and asked if Curry had anything to reply. Curry denied taking part in the robbery. The agents brought the names of Wilcoxson and Nussbaum into the questioning, explaining that the FBI knew that Curry had met them in prison and that Wilcoxson had called Curry's house from the New York Statler Hotel. Curry still denied taking part in the robbery and denied that he knew Wilcoxson and Nussbaum. Apparently most of the questions during this period were asked by Agents Foley and Putz. During this time Curry was told something along the lines of "Be truthful and you will be better off," but there was no elaboration as to how he

would be "better off." At 8:16 A.M. Curry was again given coffee; he declined the offer of a roll.

The questioning then turned to locating Wilcoxson and Nussbaum. They were still at large at the time, had committed other robberies prior to the Lafayette Bank robbery, and in fact later committed at least three bank robberies in Philadelphia and in suburbs of Pittsburgh in 1962. Curry was shown pictures of himself, Nussbaum and Wilcoxson which the New York Daily News had published the prior night because of the issuance of the arrest warrants. Curry then admitted that he knew them, but he continued to deny having taken part in the robbery. Agent Foley, in questioning Curry, outlined the general scheme of the robbery during this period, but, according to his testimony, did not go into explicit detail.

At 9:47 A.M., Curry was taken to the bathroom by Agents Keefe and Putz and was then photographed. Curry claims that four agents took him into the bathroom and, because they appeared set to beat him, he told them that he would confess. Both Keefe and Putz testified that no such threats were made and that Putz, in the men's room, merely pointed out some of the inconsistencies in Curry's statements. At about this time, the agents became convinced that Curry was ready to disclose what he knew about the robbery.

At 9:56 A.M. Curry and the two agents returned to the interview room and the questioning continued. At 10:00 Curry stated, "Yes, I was in on it," and proceeded to admit his part in the robbery. Agent Foley took the information down in narrative form; after he finished his story, Curry read the statement for about ten minutes. He then signed it at 11:18 A.M. after writing at the end a sentence dictated by Foley that the statement was true and correct.

1. Detective Lesson left the room about 9:15 A.M. His partner, Detective Sutton, listened to the questioning for one-half hour beginning about 10:00 A.M. Detective Rostow also listened in after Curry began to tell of his complicity (about 10:00 A.M.). None of the detectives took part in the questioning.

Meanwhile, Commissioner Shiffman had been advised of Curry's arrest and had told the agents he would be ready for arraignment about 1:00 P.M. Curry was now driven to the office of the United States Attorney in Brooklyn, arriving about noon. He talked at length with his mother in the office of an Assistant United States Attorney until his arraignment just before 1:00 P.M.

Upon arraignment, Curry was again warned that he was entitled to remain silent and to have legal counsel. The Commissioner informed him that, "We will get the Legal Aid Society to defend you if you have no money to provide yourself with counsel." Curry replied, "I want to furnish my own attorney."

On the following day, Curry was interviewed at the Federal House of Detention at West Street, Manhattan, by FBI agents. He gave an oral statement filling in some of the details of the crime. Other interviews were held on February 15, 16, 21, March 6 and 7. Written statements were signed by Curry on February 13 (the original statement), 15, 16 and 21. Curry was under no obligation to see any visitors at West Street and his permission was necessary for the agents' entry. At the beginning of each of the interviews he was warned of his rights to counsel and to remain silent.

During this period, Curry consented to repeated adjournments of a preliminary hearing before the United States Commissioner. The February 13 hearing was adjourned one week to afford Curry time to secure counsel. Curry appeared unrepresented a second time and the matter was put over to March 7. Curry again appeared without counsel, and the hearing was put over until March 21, when he appeared with counsel and waived a hearing. At each of these appearances the Commissioner made repeated offers of Legal Aid counsel, but these were refused by Curry because he wished to secure an attorney through his own means.

A motion to suppress Curry's statements to the FBI was first passed upon by Judge Abruzzo, who denied the motion. Judge Abruzzo rejected Curry's allegations that the agents had threatened to have Curry's son and his mother's six foster children taken away and held that the statements were not coerced in any way. He also noted that Curry "is one of the smartest witnesses I have ever seen on the stand in my experience." Signed confessions dated February 13 and 15 and a report of an oral confession made February 14 were received into evidence at the first trial.

The motion to suppress was renewed at the second trial and additional proof was taken before Judge Dooling. Judge Dooling found that "Physical force or specific promises are not found to have overcome defendant's [sic] Curry's will." He also found that while "a primary objective of the interrogation was to obtain from Curry admission of his guilty involvement and a confession if possible," "a substantial part of the time was spent on getting biographical data on Curry himself and in getting data on Wilcoxson and Nussbaum." However, differing with Judge Abruzzo, he held that suppression was required for two reasons: because Curry had been interrogated without the advice of counsel, and because the initial statement had been elicited during a period of unnecessary delay prior to a preliminary hearing in violation of Rule 5(a) of the Federal Rules of Criminal Procedure. United States v. Curry, D.C., 227 F.Supp. 773 (1963). At the same time, Judge Dooling advised the parties that the government could make use of parts of the statements collateral to the issue of guilt if Curry took the stand and if his testimony was at variance with such statements, citing Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954).

As we mentioned above, Curry did testify in his own behalf, and on two collateral matters the government was permitted to use Curry's suppressed statements to impeach his testimony. Curry was asked why in his statements to the FBI agents he did not mention the part played by Streets, Cunningham and Pettit and why he said that he had met Martin only once, in October 1961. Cur-

ry replied that he had not wished to incriminate persons whom the FBI did not know were implicated. He was also asked whether he told the agents that he had worn a false moustache on December 8, the day of the abortive first attempt to rob the Lafayette Bank (Curry had testified on direct examination that he did not wear such a moustache on December 8).[2] He replied that he had not, although he was not certain. Agent Putz was recalled to the stand after Curry's testimony and testified that Curry had told the agents that he had worn a false black moustache affixed by Nussbaum just prior to the December 8 attempt. Putz also testified that the agents had questioned Curry about Cunningham and Pettit because they were known associates of Nussbaum and Wilcoxson and that Curry had said he had not seen Pettit or Cunningham since meeting them in Chillicothe. According to Putz, Curry also told the agents that he knew Martin only as a friend of Nussbaum.

We hold that it was proper for the district court to permit this use of Curry's statements for two reasons. First, although the government cannot use the fruits of illegal action to establish the elements of the crime with which the defendant is charged, if the defendant offers testimony contrary to the facts disclosed by evidence which has been suppressed, the government may in the interest of truth use this illegally obtained evidence to establish facts collateral to the ultimate issue of guilt. Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954).

In Walder the petitioner took the stand during his trial for illicit transactions in narcotics and testified that he had never possessed narcotics illegally. The government then introduced testimony that, nearly two years previously, the police had seized narcotics from the petitioner, which evidence had been suppressed at a prior trial because it was obtained during an unconstitutional search of petitioner's home. The Supreme Court held that such a limited use of the fruits of an unconstitutional search and seizure was permissible: while a defendant must be free to take the stand and to deny the elements of the crime with which he is charged without fear that his testimony will permit the prosecution to introduce evidence illegally obtained from him and thus unavailable in the government's case-in-chief, said the Court, citing Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925), there is no justification for letting a defendant affirmatively resort to perjured testimony as to collateral matters in reliance upon the government's inability to challenge his credibility.

The Walder doctrine governs here and permits the government's use of Curry's statement on his cross-examination. Although the government was precluded by the ruling of the district court from using in its direct case Curry's admissions that he participated in the robbery, when Curry attempted to construct an alibi inconsistent with his original statements to the FBI, the government could point out inconsistencies as to collateral items such as whether additional parties were implicated and whether Curry had worn a moustache on a prior occasion.[3] Thus the government may not make any use of evidence which has been suppressed in order to make out

2. Curry was also asked during cross-examination whether he had told the FBI that he wore a false moustache on the morning of December 15, but this was withdrawn before answer. The question of the moustache was important because witnesses at the bank had said that the Negro robber wore a moustache. However, a dispute over whether the defendant wore a similar disguise on a prior occasion is, like the prior possession of narcotics in Walder, a collateral issue going to credibility and not to guilt.

3. Johnson v. United States, 120 U.S.App. D.C. 69, 344 F.2d 163 (1964) (2-1), is distinguishable on its facts. There, the defendant's confession to the crime for which he was being tried was used to impeach his testimony at the trial as to his version of the events charged in the indictment; thus, it "directly challenged the innocence, not merely the credibility, of the defendants." 344 F.2d at 166. This is not the sort of impeachment as to collateral matters which Walder permits.

a case which is strong enough to have the jury pass upon guilt or innocence. And, likewise, the defendant's denial of the elements of the crime may not be disputed by evidence which is the fruit of illegal action. See Agnello v. United States, supra. But once the government has presented a prima facie case without using such evidence, it may use the suppressed evidence to challenge the truth and reliability of the defendant's assertions as to collateral matters.

The Walder case involved the admissibility of tangible evidence obtained through an unconstitutional search and seizure. However, the Walder doctrine has been applied to permit the limited admission into evidence of prior inconsistent statements, made by a defendant during a period of unnecessary detention which violated Rule 5(a) of the Federal Rules of Criminal Procedure, and excluded from use in the prosecution's case-in-chief by the McNabb-Mallory doctrine. Tate v. United States, 109 U.S.App.D.C. 13, 283 F.2d 377 (D.C.Cir. 1960). See also Lockley v. United States, 106 U.S. App.D.C. 163, 270 F.2d 915, 918 (1959) (dissenting opinion). Curry argues first that the Walder doctrine is inapplicable whenever the Constitution directly requires the exclusion of evidence, second that Walder was therefore implicitly overruled by Mapp v. State of Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), because Mapp made the exclusionary rule at issue in Walder a part of the Fourth Amendment's guarantee, and finally that Tate is inapplicable because it dealt with an evidentiary rule whereas Curry's statements were excluded because they were obtained in violation of his Sixth Amendment right to counsel.

We do not agree that the Walder doctrine was in any way weakened by Mapp v. State of Ohio. The rule excluding unconstitutionally seized evidence in a federal prosecution had, according to the author of Mapp itself, 367 U.S. at 646–

649, 81 S.Ct. 1684, always been a part of the Fourth Amendment's guarantee. Although this assertion has been disputed,[4] and although Mapp was the first case to hold that the exclusionary rule is a Due Process requirement of the Fourteenth Amendment, we do not think that this extension of the exclusionary rule requires *per se* an alteration of principles previously applied to federal prosecutions.

Neither Walder nor any of the cases directly interpreting it indicates that the principle of limited admissibility for collateral impeachment purposes is inapplicable when evidence is excluded because unconstitutionally obtained. An exclusionary rule, whether based on constitutional principles or not, is meant primarily to protect those accused of crime from unfair or unconstitutional police procedures by removing the strongest police incentive to use such procedures. Such a rule often results in excluding highly reliable evidence in order to ensure that those who enforce the law will not profit from violating the law. But it does not follow that, if such evidence is excluded for one purpose, it must be excluded for all purposes. It is enough to deter illegal police activity if the government is prohibited from using evidence obtained by such activity to prove its direct case. In view of this adequate penalty, to deny to the government the use of Curry's statement to impeach his contrary testimony at trial would be an unnecessary impediment to the search for truth.

We think that the Supreme Court's decision in Walder is in no way modified by the subsequent decision in Mapp. In addition, we find the justification for letting a defendant testify without cross-examination as to collateral matters which can be reliably impeached no greater where the suppressed evidence is an admission made in the absence of counsel guaranteed by the Sixth Amend-

4. See Friendly, The Bill of Rights as a Code of Criminal Procedure, 53 Calif. L.Rev. 929, 952 n. 118 (1965); compare Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925).

ment. It is true that, if a prior admission were found to be unconstitutionally coerced, the substantial possibility that the admission is no more reliable than the contrary testimony of the accused at trial should lead a court to proceed with caution in permitting its use for impeachment purposes. See People v. Underwood, 61 A.C. 94, 37 Cal.Rptr. 313, 389 P.2d 937 (Sup.Ct.1964). But where, as here, there is no good reason to believe that a prior inconsistent statement was not accurate and voluntary, we find the Walder principle controlling.

■ Finally, we find the Walder principle applicable even though the jury was not instructed, as was the Walder jury, that the rebuttal evidence must be used for impeachment purposes only. While it would have been preferable to have had such limiting instructions, none were requested by Curry. "The better opinion is that the *opponent of the evidence must ask for that instruction;* otherwise, he may be supposed to have waived it as necessary for his protection." 1 Wigmore, Evidence § 13, at p. 301 (3d ed. 1940) (emphasis in original). The defense may not remain silent in hopes that the district court will fall into reversible error where the possible error could have been passed upon and cured, if need be, by a properly timed objection.[5] United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965).

In our opinion, there is a second reason why the use of Curry's statements was not improper. We find that the statements were not taken in violation of Curry's rights under the Sixth Amendment and under Rule 5(a) of the Federal Rules of Criminal Procedure and that the trial court erred in excluding them from the government's case-in-chief.[6]

■ The statement of February 13 was not taken during a period of unnecessary delay before arraignment in violation of Rule 5(a), Federal Rules of Criminal Procedure, and thus it should not have been excluded under the doctrine of Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). As the questioning demonstrated and as Judge Dooling found, the agents were not using the interview solely to secure a confession from Curry. The location of Nussbaum and Wilcoxson, who were still at large, was of prime importance. A substantial portion of the questioning pertained to their whereabouts and to Curry's background. In addition, the agents could not be sure at the time of Curry's arrest that he had taken part in the robbery. Witnesses at the bank had said that the Negro robber was tall and light-skinned whereas Curry is fairly short and dark. The record does not reveal what information led to the issuance of arrest warrants for Curry, Nussbaum and Wilcoxson, but it was proper for the agents to question Curry, in a noncoercive manner and after warning him of his constitutional rights, to determine whether there was sufficient evidence to charge.

■ By 10:00 A.M. Curry had begun to recite the part he played in the robbery and the parts played by Nussbaum and Wilcoxson. Even before this, Curry had given indications that he knew more than he was telling. At this earlier point, even if a Commissioner had been available, it was not incumbent upon the FBI to interrupt the interrogation, "as a fruitful investigation was in progress, and valuable momentum was not to be lost." United States v. Vita, 294 F.2d 524, 531 (2 Cir. 1961), cert. denied, 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788

5. In addition, our finding, *infra*, that the statements should have been ruled admissible for any purpose, obviates the need for limiting instructions.

6. While the government has not asked us to reexamine Judge Dooling's decision suppressing the statements in the government's case, it is appropriate to do so

because, if the statements would be admissible generally at a new trial, Curry could of course gain little satisfaction from a decision that they were used improperly under the Walder doctrine here. Compare Lockley v. United States, 106 U.S.App.D.C. 163, 270 F.2d 915, 917 (1959).

(1962). The delay to reduce the statement to writing and to have Curry read and sign it likewise was not unnecessary. United States v. Ladson, 294 F.2d 535 (2 Cir. 1961), cert. denied, 369 U.S. 824, 82 S.Ct. 840, 7 L.Ed.2d 789 (1962).

We may now turn to whether the manner in which Curry was questioned violated his right to counsel. We hold that it did not because we find that, on the facts of this case, Curry waived whatever rights he had to remain silent and to be interrogated only after he had had the benefit of counsel. Apparently, Curry on his own decided that it would be best for him to give the appearance of cooperating fully with the FBI in their investigation. Although Curry stated at the beginning of the questioning on February 13 that he had a lawyer and that he wanted to contact his lawyer, he did not respond to the agents' offer of a telephone and he did not object when they proceeded with the questioning. Moreover, Curry was warned of his rights before the February 13 interview and before each of the subsequent interviews which he granted to the agents who visited him at West Street. These later interviews took place between his appearances before Commissioner Shiffman, who continually apprised him that legal counsel was available immediately and that it was in his best interest to secure legal counsel at the earliest opportunity. In the face of these warnings, Curry refused to accept Legal Aid assistance and continued to cooperate with the FBI by granting interviews and giving signed statements. Under these circumstances and considering Curry's previous experience with the criminal law, the failure of the agents to respond to his

ambiguous request for counsel on February 13 did not "infect his subsequent trial with an absence of 'that fundamental fairness essential to the very concept of justice.'" Crooker v. People of State of California, 357 U.S. 433, 440, 78 S.Ct. 1287, 1292, 2 L.Ed.2d 1448 (1958), quoted in Escobedo v. State of Illinois, 378 U.S. 478, 491, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). See also United States v Drummond, 354 F.2d 132 (2 Cir. 1965), where the circumstances were in many respects similar to the waiver in the instant case.

## II. The Jury's Determination of Sentence.

Curry next attacks the manner in which the jury considered the question of his sentence. Under 18 U.S.C. § 2113 (e)[7] the jury determines the guilt or innocence of the defendant and, in the event of conviction, it may direct that he receive the death penalty. At Curry's trial the jury considered both issues simultaneously. Curry contends that the trial judge erred in refusing to hold a two-stage trial in which the jury would hear matters relevant to sentencing after it had returned a verdict resolving the question of guilt. We hold that, under all the circumstances of this case, Judge Dooling did not abuse his discretion in conducting a unitary trial. To put this in other terms, the unitary trial did not prejudice Curry's defense, particularly in light of the fact that he never specifically requested the two-stage trial.

An initial question is whether a trial judge has the power to direct a two-stage trial under § 2113(e). Historically, there is no authority for such a power. Section 2113(e) is one of a group of statutes[8] in which Congress has

7. 18 U.S.C. § 2113(e): "Whoever, in committing any offense defined in this section, or in avoiding or attempting to avoid apprehension for the commission of such offense, or in freeing himself or attempting to free himself from arrest or confinement for such offense, kills any person, or forces any person to accompany him without the consent of such person, shall be imprisoned not less than

ten years, or punished by death if the verdict of the jury shall so direct."

8. See 18 U.S.C. § 1111 (first degree murder—"shall suffer death unless the jury qualifies its verdict by adding thereto 'without capital punishment' "); 18 U.S.C. § 1201 (kidnapping where victim harmed —"shall be punished by death * * * if the verdict of the jury shall so recommend"); 18 U.S.C. § 1992 (train

ameliorated the harshness of a mandatory death penalty by giving the jury discretion with respect to whether the death sentence shall be imposed. See Winston v. United States, 172 U.S. 303, 310, 19 S.Ct. 212, 43 L.Ed. 456 (1899). There is no indication that Congress thereby contemplated a two-stage trial of guilt and sentence. And, while the Supreme Court has never passed directly on the question, it has dealt with and upheld these statutes under the assumption that they provide for a unitary trial. See Smith v. United States, 360 U.S. 1, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1959); Andres v. United States, 333 U.S. 740, 68 S.Ct. 880, 92 L.Ed. 1055 (1948).

 Nevertheless, the unitary trial can be highly unsatisfactory. The most serious problem arises when the trial judge is compelled either to exclude evidence relevant to an intelligent disposition of the sentencing question, or to admit such evidence knowing that the trial of guilt is thereby opened to matters prejudicial and otherwise inadmissible. The Third Circuit has held that, in cases of "grave prejudice," admission of such extraneous sentencing evidence amounts to a denial of due process. See United States ex rel. Scoleri v. Banmiller, 310 F.2d 720 (1962), cert. denied, 374 U.S. 828, 83 S.Ct. 1866, 10 L.Ed.2d 1051 (1963); United States ex rel. Thompson v. Price, 258 F.2d 918, cert. denied, 358 U.S. 922, 79 S.Ct. 295, 3 L.Ed.2d 241 (1958). And four States have reacted to the problem by requiring the two-stage trial by statute. N. Y. Penal Law, Consol.Laws, c. 40, § 1045-a (McKinney Supp. 1964); Cal. Penal Code § 190.1; Conn. Gen. Stat. § 53–10 (Supp. 1963); Penn. Ann. Stat. tit. 18, § 4701 (1963).

See also Model Penal Code § 210.6 (Proposed Official Draft, May 4, 1962).

 Since the unitary trial poses these fundamental problems, we do not interpret the silence of Congress on this question as precluding the trial judge from confining the first presentation to the jury to the issue of guilt when the defendant's right to a fair trial would be jeopardized by a unitary trial. If a verdict of guilty is returned, the same jury can then hear such additional evidence as the government and the deendant might wish to introduce before determining the sentence.

However, we think it unwise to *require* the two-stage trial in every case under § 2113(e) and related statutes. Only three of nine members of the District of Columbia Circuit sitting *in banc* suggested that the two-stage trial be required under an analogous provision in the D.C.Code; and Judge Burger in his separate opinion pointed out potential problems which this procedure might raise. Frady v. United States, 121 U.S. App.D.C. 78, 348 F.2d 84, 115–116, cert. denied, 382 U.S. 909, 86 S.Ct. 247, 15 L.Ed.2d 160 (1965). See generally Note, The Two-Trial System in Capital Cases, 39 N.Y.U.L.Rev. 50 (1964). Moreover, it has been suggested that the two-stage trial does not always work to the defendant's advantage,[8a] and we are loath to compel unwilling defendants to submit to a procedure which is devised for their benefit but which may be prejudicial in its application to a particular case. Given the many considerations which may affect the necessity for a two-stage trial in each case, and considering the questionable desirability of this untested technique, we think it best to leave this

wrecking where death caused—"shall be subject also to the death penalty or to imprisonment for life, if the jury shall in its discretion so direct"). Compare 18 U.S.C. § 2031 (rape—"shall suffer death, or imprisonment for any term of years or for life").

8a. "The California experience, dating back to 1957, has rather been that defense counsel have often neglected to prepare

adequately for the penalty phase and have exhibited a lack of sophistication concerning what facts should be advanced as mitigating. * * * On the other hand, the prosecution has taken complete advantage of the penalty phase and has attempted to marshal and to present to the jury all of the aggravating circumstances that exist." Note, 39 N.Y.U.L.Rev. 136, 167 (1964).

question to the discretion of the trial court.

We find no error in Judge Dooling's handling of this question at Curry's trial. The issue was raised by defendant's pre-trial motion to dismiss the indictment on two grounds, one of which was that "The absolute power given the jury by 18 U.S.C. § 2113(e) to fix the death penalty violates the constitutional guarantee against deprivation of life without due process of law." Judge Dooling initially ruled that the statute was constitutional, but he noted that the unitary trial might raise problems of "the standards of relevancy that will prevail in United States against Curry," and he deferred ultimate disposition of the motion.

The defendant again requested disposition of his motion two days later during another pre-trial colloquy. Judge Dooling still found the question premature, but he stated that "it would be unthinkable if such matters [evidence relevant only to sentence] were brought in to the normal criminal trial of the general issue in a criminal case," and he suggested "that if there is precedent for it * * * consideration of serially [sic] verdicts be undertaken, and that the second verdict should be restricted to the matter of sentence and be based, if need be, on additional evidence which may be appropriate." At this point, government counsel stated:

"Your Honor, it is the Government's intention to offer evidence only on the issue [of] guilt or innocence * * * As to the proper procedure under consideration of sentence, I would submit that this consideration could well be deferred on the agreement of both

counsel until a later time in the case, when perhaps our choices would be more apparent; that is, choices of procedure would be a little bit more clear to us than they are to us at the present time.

The Court: Very well."

Defense counsel made no comment or objection to this suggestion.[8b]

At the close of the government's case, during which no evidence relevant solely to the sentence was introduced, the defendant's attorney again renewed his motion to dismiss the indictment. He now alleged that the count charging a violation of § 2113(e) should be dismissed because the possibility of a death sentence deprived Curry of a fair trial in that it compelled him to take the stand to gain the jurors' sympathy. Judge Dooling adhered to his ruling that the statute was constitutional. He did not interpret the defendant's motion as requesting a two-stage trial, and defense counsel at that point stated, "I have no further motions at this time, your Honor."

▌ After Judge Dooling had shown sympathy for a two-stage trial, and after government counsel had invited consideration of that procedure, we think the defendant should have moved for a severance of the issues of guilt and sentence at the conclusion of the government's case if he felt that he was still at any disadvantage in a unitary trial. He could not expect Judge Dooling to sever these issues *sua sponte*, particularly when the Judge had manifested some doubt as to his power to order such a trial under § 2113(e). See United States v. Dalhover, 96 F.2d 355, 261 (7 Cir.1938) (dissenting opinion).

**8b.** At no time during the trial did the government suggest the death penalty. On the contrary, the government made it clear that it did not ask the jury to impose the death penalty. In summation, government counsel said:

"I do not presume to advise you [regarding the death penalty]. This is solely your job.

I do however have the authority of the Attorney General of the United

States and the authority of Mr. Hoey, who is the United States Attorney for this district, to tell you that the *Government does not seek the death penalty against this defendant.* Again I say to you that the decision is solely yours." (Emphasis supplied.)

Judge Dooling reminded the jury of this suggestion during his charge, and of course a death sentence was not returned.

██ We agree with Judge Dooling that § 2113(e) is constitutional. And we think it was appropriate to defer consideration of whether a two-stage trial was necessary. After this deferral, the government, in accordance with its stated intention, introduced no evidence relevant only to sentencing and the defendant never specifically requested a two-stage trial. Under all these circumstances, we think it was within the discretion of Judge Dooling, who had observed the nature of the government's case and the defense strategy, to reject the unsupported assertion by Curry's counsel that the unitary trial would force him to put the defendant on the stand.[8c] Once Curry took the stand, his testimony concerning his background and prior convictions, which he gave during his direct testimony but which he now alleges prejudiced his claim of innocence, was available to either side and cannot be considered prejudice flowing from the unitary trial.[8d]

██ We think we should note for the future that, where it is clear that a defendant is requesting a two-stage trial, it would be preferable to grant such a request. However, the dangers inherent in the unitary trial which lead us to that conclusion were not present in Curry's trial, where no evidence relevant only to sentencing was introduced by the government and where the jury in fact did not recommend death. When we consider the careful manner in which Judge Dooling guarded against the prejudicial aspects of the unitary trial, the ambiguous manner in which the defendant presented this question to the trial court, and the long and unbroken history of unitary trials under this and other federal statutes, we are unwilling to conclude that the unitary trial so prejudiced Curry's presentation of his defense that Judge Dooling abused his discretion in allowing it to proceed. Compare United States ex rel. Rucker v. Myers, 311 F.2d 311 (3 Cir. 1962), cert. denied, 374 U.S. 844, 83 S.Ct. 1901, 10 L.Ed.2d 1064 (1963).

### III. *The Selection of the Jury Panel.*

Curry challenges the method of selecting juries in the Eastern District of New York, claiming that it systematically excludes Negroes from jury service. Judge Dooling held a hearing and made extensive and complete findings on this issue. He concluded that no intentional exclusion of Negroes or of any class of persons had taken place and that no manifestly workable and economically feasible method that would better secure a representative jury list had been neglected. We agree.

██ Essentially, Curry's claim is that the Negro population in the Eastern District of New York is centered in "islands" of concentration and that the method of compiling the jury list failed adequately to account for this disproportion.[9] We find that, although the method for compiling the list does not completely take into account the unevenly

---

**8c.** In our opinion, a reading of the entire transcript creates the unmistakable impression that the death sentence was never a serious issue in this case and that Curry's allegations to the contrary to this court are frivolous. Indeed, the tenuous nature of Curry's argument that he was induced to take the stand is revealed by his admission, in a post-trial memorandum in support of his motion for new trial, that his testimony was necessary to prove his innocence:

"Certainly, defendant was unable to meet Wilcoxson's testimony at the trial other than by taking the stand and denying participation in the crime. Wilcoxson and Nussbaum said he was there, defendant said he was not."

**8d.** The great bulk of Curry's 1½ days and 330 pages of direct testimony was aimed at establishing his alibi. The only testimony conceivably relevant solely to to the sentence concerned Curry's prior criminal convictions; such evidence is commonly introduced by defendants during their direct testimony merely to neutralize a likely area of cross-examination. Thus, Curry's only serious contention is that he was induced to take the stand, a contention which, as explained above, we reject.

**9.** Nine per cent of the District is Negro.

distributed population, it does not violate constitutional requirements.

Voter registration lists form the basis for 99 per cent of the prospective jurors.[10] Names are chosen at random from the voter list of each assembly district in the Eastern District to comprise the petit jury list of 7000 to 7500. This basic list is replenished or expanded as the need arises by qualifying additional persons randomly selected from the voter registration lists. Under a plan recently adopted by the Jury Clerks, these additional names are selected from only a few of the assembly districts in the District at any one time. The Clerks have insufficient funds and personnel to draw on a random basis the relatively few names added each year from all the districts. However, over a long period of time, the system is designed to insure that each assembly district will contribute a representative number of persons to the jury list. Curry's chief argument appears to be that those added in this manner in recent years have not come from districts with a high Negro population.

The petit jury "box" or "wheel" here contained at least 300 juror cards chosen at random from the jury list in the manner required by 28 U.S.C. § 1864. The jury which served during Curry's second trial was chosen from among 300 persons summoned for jury duty on November 4, 1963. Of the 170 of these persons who entered upon jury service, two or three appeared to be Negroes. One hundred ten veniremen were sent to the part of the court in which Curry's case was pending. None of these appeared to be Negro.

 One these facts, we conclude, as did Judge Dooling, that Curry has not established, as he must, see Swain v. State of Alabama, 380 U.S. 202, 205–209, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), a prima facie case of discrimination. The method of selection appears designed neither to favor nor discriminate against any particular group. It is axiomatic at this late date that "proportional representation" or any method of intentionally attempting to select jurors on the basis of racial, religious, economic or social grouping is not required by the Constitution and indeed would be an unworkable and repugnant policy. See, e. g., United States v. Flynn, 216 F.2d 354, 388 (2 Cir. 1954), cert. denied, 348 U.S. 909, 75 S.Ct. 295, 99 L.Ed. 713 (1955). "[T]he Constitution requires only a fair jury selected without regard to race." Cassell v. State of Texas, 339 U.S. 282, 286, 70 S.Ct. 629, 631, 94 L.Ed. 839 (1950).

In any small sample of a group this size (here, 3,000,000 voters), it is probable that the sample will not reflect a cross-section of the community. And, of course, the fewer assembly districts that are included in the sample, the greater the homogeneity of the panel, since members of the same racial, religious and social groups tend to congregate in the same geographical areas. Therefore, it is to be expected that there will be a disparity between a model cross-section of the community and the sample comprising the petit jury list, and more so with those who are ultimately called for service during one particular period, or those assigned to a particular trial part, or those chosen to serve on a particular jury.

 While it is desirable to include a larger number of names on the jury list, and to choose additional names from more assembly districts, the Jury Clerks can only be required to work within the limits of personnel and funds which are available to them, provided that minimum standards are met. Although total exclusion or only token inclusion of a particular race on all juries in a district may be evidence of systematic discrimination, see, e. g., Smith v. State of Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940), "an imperfect system is not equivalent to purposeful discrimination

10. Reliance upon voter registration lists is an acceptable method of obtaining lists of qualified jurors. United States v. Agueci, 310 F.2d 817, 833, 834, 99 A.L.R. 2d 478 (2 Cir.1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1016, 10 L.Ed.2d 12 (1963); United States v. Greenberg, 200 F.Supp. 382 (S.D.N.Y.1961).

based on race." Swain v. State of Alabama, 380 U.S. at 209, 85 S.Ct. at 830.

In the cases cited by Curry to support his contention, Negroes were excluded from juries in districts with long histories of such discriminatory conduct. This class of cases was distinguished by this court in United States v. Flynn, supra. Curry has failed to establish a "purposeful, systematic non-inclusion because of color" which would indicate that discrimination has taken place. Cassell v. State of Texas, 339 U.S. at 291, 70 S. Ct. at 633 (Frankfurter, J., concurring). Nor has he justified an inference that discrimination has taken place by showing a continued absence of Negroes on juries in the District. Compare Smith v. State of Texas, supra; United States ex rel. Seals v. Wiman, 304 F.2d 53 (5 Cir. 1962), cert. denied, 372 U.S. 924, 83 S.Ct. 741, 9 L.Ed. 729 (1963). We therefore agree with the district judge that Curry has failed to establish a prima facie case of discrimination in the selection of the juries in the Eastern District of New York.

### IV. *Motion for New Trial.*

■ Curry moved for a new trial (Rule 33, Federal Rules of Criminal Procedure), alleging recantation by Valerie Brunner of her testimony against Curry at trial, and new testimony by Michael Quinn and Earl McKenzie that Bobby Wilcoxson admitted to them that he framed Curry. Judge Dooling held an extensive hearing and found that:

"Miss Brunner's recantation is not credible and the credibility of her trial testimony is unaffected by her post-trial declarations and testimony. No weight can be given to the Quinn-McKenzie testimony whether it is treated as merely fanciful, or as a credible report of Wilcoxson's subsequent statements that what he said under oath at the trial was untrue."

We find no error in these findings.

Valerie Brunner, who was twenty years old at the time of the hearing on the motion for new trial, was Curry's foster sister and sometime fiancee. She had given statements consistent with her trial testimony to the Grand Jury, the FBI and Curry's trial counsel prior to trial. At trial she testified to Curry's associations with Wilcoxson and Nussbaum; his receipt of money from Nussbaum; his claims, after the robbery, that he was entitled to money from Nussbaum and Wilcoxson; his receipt of a second-hand automobile from Wilcoxson after the robbery; and his trips to the Buffalo base of operation before and after the robbery.

Miss Brunner's recantation related solely to two other portions of her testimony: first, that Curry told her that he had gone into the bank, armed with Wilcoxson, to commit the robbery while Nussbaum waited outside; second, that she overheard, around Thanksgiving Day prior to the robbery, Curry and Wilcoxson discussing elements of the plot on the telephone, that Wilcoxson later told her to forget what she had heard, and that Curry told her that her eavesdropping had required a change of plans.

After viewing Miss Brunner both at trial and at the hearing, Judge Dooling found that the recantation "is unconvincing in the extreme." There is no reason for us to disagree with this finding.

■ When as here the district judge resolves all doubt against the defendant and determines that the trial testimony is not impeached by the recantation, there is no need to try the case anew before a jury. In United States v. Flynn, D.C., 130 F.Supp. 412, reargument denied, 131 F.Supp. 742 (S.D.N.Y.1955), Judge Dimock assessed the plausibility of an alleged recantation before deciding whether to grant a new trial, and we approve that procedure here. Such a procedure has special merit where the hearing judge presided at trial and thus is better able to evaluate the alleged recantation. See United States v. On Lee, 201 F.2d 722 (2 Cir.), cert. denied, 345 U.S. 936, 73 S.Ct. 798, 97 L.Ed. 1364 (1953); Harrison v. United States, 191 F.2d 874, 876 (5 Cir. 1951).

Quinn and McKenzie testified at the hearing that, while lodged at West Street jail awaiting sentence on various charges of bank robbery, they met Wilcoxson, who confided that he had framed Curry and that, in fact, Curry had withdrawn before the commission of the robbery. After their own sentencing and after Wilcoxson had been transferred out of West Street to begin serving his life sentence, Quinn and McKenzie permitted Curry to call them as witnesses at the hearing.

Judge Dooling found that "The testimony of Quinn is not believed" and that McKenzie's testimony " * * *, was hardly credible." Curry made no attempt at the hearing to produce Wilcoxson or to have him called as a witness of the court. Had Curry wished to substantiate the allegation that Wilcoxson had altered his story—and that he would do so again if called to testify at a new trial—Curry should have made efforts to establish this directly from Wilcoxson.

 Finally, even if the testimony of Quinn and McKenzie were true, it was not new evidence bearing on the guilt or innocence of Curry, but merely evidence bearing on Wilcoxson's credibility. Such evidence alone is not sufficient basis for obtaining a new trial. Cf. United States v. Switzer, 252 F.2d 139, 145–146 (2 Cir.), cert. denied, 357 U.S. 922, 78 S.Ct. 1363, 2 L.Ed.2d 1366 (1958).

Walter R. Mansfield and Robert F. Morten, assigned counsel for Curry, have rendered devoted and effective service on this appeal and on the motion for a new trial, as have Peter W. Mitchell and Roger J. Hawke who were with them on the brief.

Affirmed.

HAYS, Circuit Judge (dissenting):

I would reverse our previous opinion and send the case back for a new trial. Whenever a jury, acting pursuant to a federal statute, is to decide guilt or innocence in a capital case, and is accorded the responsibility of choosing between death and life imprisonment as the punishment to be imposed, the course of enlightened and efficient administration of the criminal law will best be served by requiring a two-stage trial.

In our original panel opinion we held that "the failure of the defendant to object to the unitary trial at the outset" precluded a finding of reversible error. Our attention has now been called to the following statement of Curry's counsel:

"Now, *may I ask you not* [now?] to give it further consideration or do you believe any further consideration is necessary at this time with regard to the problems that you stated the other day that occurred to you, arising out of my motion to dismiss the indictment, *in particular as to the question of the trial of the sentence as a possibility separate and apart from the trial of the crime.*" (Emphasis added.)

However we read the word "not," the last part of the statement indicates that counsel intended his motion as a request for separate trials. Judge Dooling was fully aware of the nature of, and reason for the request.[1]

1. During proceedings relating to the composition of the jury, Judge Dooling noted:
"If Mr. Curry, for example, offers evidence as to his background, the privations of his youth, all of the other things that would be relevant upon sentencing, then can that be met by an attempt on the part of the United States to offer evidence of previous conviction?
*"Does it all suggest the possibility that maybe in such a case as this there have to be two verdicts?* And whether we like it or not, does Section 1045 of the Penal Law come in here as a matter of common law technique of trying the case on the issue of guilt first, and then sending the jury out again, perhaps with supplementary evidence on the issue of sentence, should there be a conviction on count three?" (Emphasis added).
Preceding the opening statement of the prosecution, Judge Dooling observed:
"That suggested in my mind that if there is precedent for it, and arrived at without the assistance of such statutes as Section 1040 of the New York

As the close of the government's case, appellant's counsel said:

"It seems to me, your Honor, that the present statute which gives the jury the duty of making the decision as to whether or not there shall be capital punishment, *places upon the defense a most unique and improper burden throughout the whole of the trial from the beginning of the Government's first witness to any witnesses that we put forth.* This is, I think, a very unusual situation, creating what I urge upon you is a deprivation of a fair trial." (Emphasis added.)

These remarks must be regarded as renewing counsel's earlier motion.

We need not decide whether a unitary trial is so unfair as to constitute a deprivation of due process. See United States ex rel. Scoleri v. Banmiller, 310 F.2d 720 (3d Cir. 1962), cert. denied, 374 U.S. 828, 83 S.Ct. 1866, 10 L.Ed.2d 1051 (1963). We need only hold that 18 U.S.C. § 2113(e) requires a two-stage trial, a first stage concerned with guilt or innocence, and, if it is determined that the defendant is guilty, a second stage to fix the penalty.

Although the majority concede that neither the statute nor the legislative history suggest any bar to such a procedural form, they leave the question of a two-stage trial to the discretion of the trial court. There is scarcely any authority to suport the majority's conclusion. The majority cite only a dissenting opinion in Frady v. United States, 121 U.S.App.D.C. 78, 109–110, 348 F.2d 84, 115–116, cert. denied, 382 U.S. 909, 86 S.Ct. 247, 15 L.Ed.2d 160 (1965), and two student notes, The Two-Trial System in Capital Cases, 39 N.Y. U.L.Rev. 50 (1964) and Executive Clemency in Capital Cases, 39 N.Y.U.L.Rev. 136, 167 (1964). The first note, after pointing out several shortcomings in the two-stage trial provision adopted by New York, concluded that "the overall scheme of these amendments to the capital pun-

ishment law is a significant step in the direction of a worthy goal. \* \* \*" Id. at 77. The second note, incidentally and without a substantiating citation, observed that California "defense counsel have often neglected to prepare adequately for the penal phase." The Commentary to the Model Penal Code § 201.6 at 75 (Tentative Draft No. 9, 1959) concluded that the results under the California statute "are eminently satisfactory."

The majority disregard the great weight of case and commentary authority, which calls for the establishment of a mandatory two-stage trial rule. See, e. g., Frady v. United States, 121 U.S. App.D.C. 78, 85–87, 348 F.2d 84, 91–93, particularly p. 91 n. 1, cert. denied, 382 U.S. 909, 86 S.Ct. 247, 15 L.Ed.2d 160 (1965); United States ex rel. Scoleri v. Banmiller, supra; United States ex rel. Thompson v. Price, 258 F.2d 918, 922 (3d Cir.), cert. denied, 358 U.S. 922, 79 S.Ct. 295, 3 L.Ed.2d 241 (1958); Model Penal Code § 210.6 (Proposed Official Draft, May 4, 1962); 1 Wigmore, Evidence § 194b, at 660–61 (3d ed. 1940); cf. Jackson v. Denno, 378 U.S. 368, 389 n. 16, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

Rational determination of punishment requires that the sentencing authority have wide access to information of a mitigating nature. Judge McGowan has observed:

"[T]he jury's deliberations upon his [the defendant's] punishment are less than adequately informed if his right of allocution has not been meaningfully available and if facts of a mitigating nature are not before it." Frady v. United States, supra 348 F.2d at 91-92. (McGowan, J., concurring.)

See, Model Penal Code § 210.6 (Proposed Official Draft, May 4, 1962); Knowlton, Problems of Jury Discretion in Capital Cases, 101 U.Pa.L.Rev. 1099, 1109, 1135-1136 (1953).

Penal Law, that consideration of serially verdicts be undertaken, and that the second verdict should be restricted to

the matter of sentence and be based, if need be, on additional evidence which may be apropriate."

By the same token, the government should be able to apprise the jury of aggravating circumstances. Such information should not be made available to the jury prior to the resolution of the issue of innocence or guilt.

Here, the practical effect of the unitary procedure was to force the appellant to relinquish his Fifth Amendment right not to testify. Immediately prior to Curry's taking the stand, his counsel pleaded:

"I feel that in effect this statute almost compels asking questions that I might not have asked otherwise on direct; and in particular almost compels that I put the defendant on the stand."

\* \* \* \* \*

"I find that in this case, with the jury having that duty to decide about capital punishment, that I am—*I feel that a defense counsel in this case is forced to put the defendant on the stand. I must show what he is like. I must reveal the kind of person he is.*

"This is beyond the question of guilt. This goes to the question of sentence, and since they have the power to sentence death, I must do it." (Emphasis added.)[2]

In an analogous situation, the Supreme Court has disapproved a procedure which "may induce a defendant to remain silent," and thus force a jury, "that is to pass on guilt or innocence as well as voluntariness," to decide on "less than all of the relevant evidence." Jackson v. Denno, supra 378 U.S. at 389 n. 16, 84 S.Ct. at 1787.

Wigmore, in discussing a now amended Pennsylvania unitary trial statute,[3] argued:

"The only way to avoid injustice in such cases is to reserve the evidence of former convictions until after a finding of guilt on the evidence in a particular case. This purpose is readily obtained by the California form of procedure. It is to be regretted that the Supreme Court of Pennsylvania did not handle the verdict procedure flexibly, and introduce this method without waiting for legislative authority. (Our Courts are too prone to wait for legislative interference before altering their procedure, which ought to be exclusively within their own control.)" Wigmore, op. sit. supra at 661.

In United States ex rel. Thompson v. Price, supra 258 F.2d at 922, the Third Circuit expressed a strong preference for a mandatory two-stage trial rule in federal cases. Judge Hastie, concurring, went further and noted:

"A procedure which greatly magnifies this risk, practically inviting the improper use of evidence, in a capital case raises a serious issue of fundamental fairness." Id. at 922.

In United States ex rel. Scoleri v. Banmiller, supra, the Third Circuit, sitting *en banc*, held a unitary trial, in Pennsylvania state courts, "so fundamentally unjust" as to amount to a denial of due process.

The Commentary to the Model Penal Code § 201.6 at 74–75 (Tentative Draft No. 9, 1959) concludes:

"There is no reason to insist upon a choice between a method which threatens the fairness of the trial of guilt or innocence and one which detracts from the rationality of the determination of the sentence. The obvious solution, proposed by the Royal Commission on Capital Punishment, is to bifurcate the proceeding, abiding strictly by the rules of evidence until and unless there is a conviction, but

2. At trial, Wilcoxson testified that Curry had actively participated with him in a cold-blooded murder during the course of the robbery of the Lafayette National Bank. It was not until the government's summation, after Curry had taken the stand, that the prosecutor announced that

he was not seeking the death penalty. Even then, the jury could have imposed that penalty.

3. Pennsylvania now requires a two-stage trial. Penn.Ann.Stat. titl. 18, § 4701 (1963).

once guilt has been determined opening the record to the further information that is relevant to sentence."

The arguments for the two-stage trial seem to me to be so compelling and the authority supporting that procedure so weighty that I must respectfully dissent.